# Illinois Official Reports

## Appellate Court

---

**People v. Cook, 2014 IL App (1st) 113079**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY COOK, JR., Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-3079 |
| Filed | May 8, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the involuntary manslaughter of his four-month-old son was upheld over his contentions that the trial court erred in failing to instruct the jury on the definition of recklessness for purposes of involuntary manslaughter and in failing to conduct a hearing on whether shaken baby syndrome passed the general acceptance test of *Frye*, since the failure to give the instruction was harmless error because the evidence of defendant's recklessness was so clear and convincing that the verdict would not have been different if the instruction had been given, and the *Frye* test did not apply to the testimony that the death of defendant's son was due to shaken baby syndrome, because the *Frye* test applies only to scientific evidence, and the identification of shaken baby syndrome as the cause of death in the case of defendant's son was the expert opinion of the medical examiner based on the examiner's personal training and experience. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-17724; the Hon. Neera Lall Walsh, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Brett C. Zeeb, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HOWSE delivered the judgment of the court, with opinion. Justices Fitzgerald Smith and Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State charged defendant, Anthony Cook, Jr., with first degree murder in the death of four-month-old Anthony Cook III. The infant, Anthony, born March 5, 2006, died July 9, 2006 as the result of subdural hematoma after having been placed on life support on June 16, 2006, when defendant discovered the infant to be in distress and took him to the hospital. Following trial, a jury convicted defendant of involuntary manslaughter. Defendant appeals, arguing the trial court erred in failing to instruct the jury as to the meaning of recklessness for purposes of involuntary manslaughter and in failing to conduct a hearing to determine whether evidence concerning shaken baby syndrome (SBS) is admissible scientific evidence. For the following reasons, we affirm.[1]

¶ 2                                    BACKGROUND

¶ 3    The indictment charged defendant, Anthony Cook, Jr., with first degree murder in that on or about May 27, 2006, continuing through June 16, 2006, defendant inflicted multiple injuries upon Anthony Cook III which resulted in his death. Prior to trial, defendant filed a motion to bar testimony about SBS. Defendant's motion sought an order barring testimony or other evidence concerning the theory of SBS, shaken impact syndrome (SIS), or abusive head trauma (AHT), on the grounds such evidence fails to pass the general acceptance test of *Frye v. United States*, 293 F. 1013 (D.C. 1923).

¶ 4    Defendant's motion described SBS, SIS, and AHT as "theories" which postulate that shaking, or shaking coupled with impact, can generate sufficient forces to cause severe brain

---

[1]The court granted the State's motion to publish the Rule 23 order originally filed in this case. This opinion reflects nonsubstantive edits that do not change the court's holdings or bases for the court's decisions and stylistic corrections to the original Rule 23 order.

and eye trauma resulting in possibly fatal injury. The motion states that based on responses to discovery, the State would attempt to introduce evidence that SBS, SIS, or AHT was the cause of Anthony's death. Defendant anticipated that the State's witnesses would testify that Anthony sustained subdural hematoma and retinal hemorrhaging as a result of manual shaking, "also known as 'Shaken Baby Syndrome/Shaken Impact Syndrome/Abusive Head Trauma' " and that SBS, SIS, or AHT was "the only mechanism by which Anthony Cook, III could have sustained these injuries." Defendant conceded Anthony "had evidence of subdural hematoma as well as retinal hemorrhaging, but showed no other injuries," including neck injuries, bruising, or any other marks. Defendant argued that no empirical data exist concerning whether a human can exert sufficient force through shaking to cause retinal hemorrhaging or subdural hematoma, and that further research has shown that manual shaking or shaking with impact is invalid as a mechanism for brain injury and death. Defendant asserted that alternate theories for the cause of Anthony's death exist and that nothing in the medical records indicated that SBS, SIS, or AHT was the mechanism of his death. Rather, "the medical records suggest that Anthony Cook, III died of natural causes." The defense asserted it was entitled to a hearing under *Frye* on the issue.

¶ 5 At the hearing on defendant's motion, defense counsel argued that SBS "simply doesn't rest in science. It's anecdotal. It's conjecture. It's never been empirically tested." For that reason, the defense asked for a hearing under *Frye* to determine whether the evidence should be allowed. Defense counsel admitted that the medical examiner's findings based on an autopsy should be allowed into evidence, but the conclusion of SBS should not be allowed. The State responded that, based on the defense's concession, and because an autopsy is not new or novel, *Frye* is not implicated. The trial court held that *Frye* is not implicated by the testimony of the medical examiner who performed the autopsy. The court held that the medical examiner's "opinion testimony regarding the cause and manner of the death of the victim *** is not scientific. Therefore, *Frye* is not implicated *** and [his] testimony is subject to the standard rules governing the admission of expert witness testimony." Defendant also filed a motion to bar testimony that SBS is based on recognized medical science and a motion *in limine* to bar the use of the phrase "abusive head trauma" or "shaken baby syndrome" during the trial. After a hearing on those motions, the trial court held that, consistent with its previous ruling, the motions would be denied. The court held that SBS, SIS, and AHT are diagnoses and are opinions. The court held that the diagnoses were opinions that may be rendered by the medical personnel.

¶ 6 Dr. Michael J. Humilier testified at defendant's trial that he was an assistant medical examiner for Cook County in 2006. Dr. Humilier's specialty is forensic pathology, which is concerned with determining the cause and manner of death in individuals who have died of nonnatural circumstances. The State asked that Dr. Humilier be qualified as an expert in forensic pathology and medical examination. The trial court qualified him as an expert in those fields without objection and ruled that Dr. Humilier may render an opinion. Dr. Humilier performed a postmortem examination of Anthony on July 10, 2006. He found no evidence of injury to Anthony's neck or skull. Dr. Humilier did not observe any skull fractures anywhere. Anthony had subdural hematoma on both sides of his brain and, according to an ophthalmologist who examined Anthony's eyes, retinal hemorrhaging.

Retinal hemorrhaging can have a number of causes and Dr. Humilier had no way to distinguish how the retinal hemorrhaging was caused in this case.

¶ 7    Dr. Humilier opined that injury to the neck would not always be observed anytime there is subdural hematoma and that it is unlikely that the injuries he observed to Anthony would be generated from just a simple fall. Dr. Humilier opined that it is possible to have, on a three-month-old baby, a subdural hematoma on both sides of the brain without having injury on the neck or broken ribs. He testified that the subdural hematoma and retinal hemorrhaging could be consistent with the baby's head shaking back and forth in a flopping motion in a violent manner, as well as with the baby being shaken and thrown into a basinet. The State asked Dr. Humilier what type of force would be necessary or would normally be seen with the type of injuries Anthony suffered. Dr. Humilier responded: "Usually with rapid shaking with impact."

¶ 8    Dr. Humilier testified, to a reasonable degree of medical certainty, that the cause of Anthony's death was due to subdural hematoma and that the manner of death was homicide. He explained that subdural hematoma is bleeding around the surfaces of the brain and in the base of the skull, the most common cause of which is the tearing of the veins that go from the brain to the top of the skull. Other causes of subdural hematoma include any type of blunt trauma and certain types of natural disease–none of which were found in this case–or from the birthing process. Subdural hematomas can happen naturally or result from falls. A fall can also produce retinal hemorrhages and cerebral swelling, thereby mimicking what would be seen with SBS. He had no evidence that tearing of the connective veins was the cause of the subdural hematoma in this case. Dr. Humilier testified that subdural hematoma occurs with a blunt trauma that can occur to the head. He described blunt trauma as a soft or firm surface that is not sharp hitting something. He testified that in Anthony's case, "you have the brain bouncing back and forth between two hard surfaces, which is the back and front of the skull, and then finally hitting a surface. That is the blunt trauma that is caused to the brain in this individual."

¶ 9    On cross-examination, defense counsel asked Dr. Humilier if something that is looked for in possible child abuse cases is fracture in the ribs or damage to the bones in the arms or damage to the vertebra. Defense counsel stated "the reason why is because the theory of the mechanism of shaken baby syndrome is that" sometimes people grab children by the rib cage and squeeze when they are shaking causing rib fractures, or they grab the child by the arm and not the rib cage, or the neck will go backwards and forwards, creating a whiplash effect. Dr. Humilier agreed those were correct statements by defense counsel and that he found no rib fractures at the autopsy and no evidence of damage to Anthony's arms. Dr. Humilier later testified that injury on the ribs, neck, and spinal cord would not always occur from a baby being shaken so that its head was flopping back and forth. Dr. Humilier also did not find any evidence of child abuse or of shaken-baby-type injuries in the spine at all. There was no evidence in the spine that Anthony was ever shaken. Dr. Humilier did not find anything from his external examination to suggest child abuse.

¶ 10    Dr. Humilier admitted on cross-examination that SBS is a diagnosis of at least some controversy in the medical community. Defense counsel asked Dr. Humilier if the theory of shaken baby is that it is an issue of acceleration and deceleration in the skull and Dr. Humilier agreed that it was. He agreed it would not be possible, ethically or legally, to

quantify the acceleration and deceleration forces required to produce injury or to prove that those forces caused bridging veins to actually sever. For that reason, Dr. Humilier agreed that SBS is experimental theory rather than scientific fact.

¶ 11　　Dr. Humilier testified that the subdural hematoma in this case was not caused by cancer, a clotting disorder, infection, or by Anthony being born, and was not what one would expect to be seen from a normal fall. There was no evidence of natural causes. Dr. Humilier later testified that his diagnosis was not SBS, but that the injuries he observed were consistent with Anthony being shaken so that his head was flopping back and forth. He made that diagnosis based on the existence of subdural hematomas on both sides of Anthony's brain.

¶ 12　　The State also called Dr. Emalee Flaherty as an expert witness in pediatrics, pediatric child abuse, and as a medical doctor, without objection. Dr. Flaherty is on the Cook County death review team. That team is an interdisciplinary team of members of the medical and law enforcement communities, as well as members from community child organizations and the Illinois Department of Children and Family Services, which reviews deaths of children that are suspicious. She is also the medical director of the protective service team, which evaluates any child where anyone has a suspicion of child abuse. Dr. Flaherty first saw Anthony in the pediatric intensive care unit at Children's Memorial Hospital (Children's). Dr. Flaherty testified that "there were multiple head CT's and MRI's done on this child which I referred to and used to form my opinion." She also relied on a report by an ophthalmologist in forming her opinion. Based on examinations at Children's, Dr. Flaherty learned that Anthony had extensive retinal hemorrhages in both eyes and subdural hematomas on both sides of his brain and over all surfaces of his brain. Anthony had both acute–meaning less than a week old–and subacute–meaning over one week but less than four weeks old–subdural hematomas over the whole brain. A full skeletal survey revealed no skull fracture. Anthony also had subdural hematomas in the whole area of his lower back.

¶ 13　　Dr. Flaherty stated that "these injuries were caused by some kind of severe acceleration and deceleration force. Some rotational forces. It would take those kinds of forces to cause the subdurals he had, extensive subdurals he had, caused the retinal hemorrhages he had, the really extensive retinal hemorrhages he had." When asked if Anthony's injuries would be consistent with someone shaking him in a violent manner and throwing him into a bassinet, Dr. Flaherty responded that "shaking and then the throwing against some surface, all of that are acceleration and deceleration forces." Dr. Flaherty's expert opinion as to the cause of Anthony's death was that he suffered abusive head trauma and physical abuse. She ruled out any other causes before coming to her opinion. She testified that Anthony's injuries were not consistent with a baby falling over or falling off of something because "[i]t would take really violent severe forces to cause these kinds of injuries." Specifically, Dr. Flaherty testified "these injuries were caused by some kind of a severe acceleration and deceleration forces, that was after we excluded all other possible causes for those subdural hematomas, for the injury to the brain tissue itself, there was no other cause, this was the only possible explanation."

¶ 14　　On cross-examination, the defense asked Dr. Flaherty how much force it takes to shake a child to cause bleeding. Dr. Flaherty responded, "I never said this child was shaken. I said that this child suffered abusive head trauma. And all I can tell you, *** [that] takes severe and violent forces to cause these kinds of injuries." The defense also asked Dr. Flaherty if it

was fair to say that there is some controversy in the medical community about whether SBS exists. Dr. Flaherty responded as follows:

> "Let me just be clear that we are not talking about shaken baby syndrome here. We are talking about abuse of head trauma. We are not talking about exclusive shaking. But just to be very clear, there really is not controversy among the medical community. There are few people who testify for the defense who have tried to suggest there is such a controversy but there really isn't a controversy."

¶ 15 Dr. Flaherty did admit, however, that "you can't verify the exact mechanism or forces because you cannot obviously do this on children."

¶ 16 Dr. Shaku Teas testified for the defense. Dr. Teas disagreed with Dr. Flaherty's finding that Anthony's injuries could only have been caused nonaccidentally. Dr. Teas testified that subdural hemorrhages can be caused by accidental trauma, natural causes, disease, or by structural abnormalities in the brain. Dr. Teas also testified that if defendant had shaken Anthony, she would expect to see a broken neck with severe trauma to the neck, cervical spine, ligaments, muscles, and spinal cord. Dr. Teas opined that the subdural hemorrhage in Anthony's lower spine could be attributable to gravity because the MRI that showed that injury was not taken until after Anthony was admitted to the hospital.

¶ 17 Dr. Teas testified that Anthony had a "lucid interval." A lucid interval is a period after a head trauma in which there are not symptoms. A lucid interval may last a few minutes, hours, days, or months. Dr. Teas testified that Anthony obviously had lucid intervals because Anthony had a chronic collection in the subdural space. Dr. Teas also noted that Anthony's mother received a drug during childbirth that stimulates contractions, but which results in the blood supply to the baby being depleted, and that Anthony had low levels of proteins S and C, which both prevent clotting. Dr. Teas opined that there were no injuries either accidentally or intentionally inflicted upon Anthony.

¶ 18 The defense also called Dr. Louis Draganich as an expert. Dr. Draganich is an expert in biomechanical engineering. Dr. Draganich reviewed all of the medical evidence and did not find any evidence of an impact to Anthony's head. In his opinion, Anthony did not have an impact to his head because there was no indication his neck or cervical spine was injured.

¶ 19 Defendant testified on his own behalf. Defendant testified he did not shake, strike, or do anything physical to Anthony on June 16, 2006, or at any time that week. On cross-examination, defendant admitted that earlier in the week defendant "lost it" and became "pissed" because Anthony was crying, but he denied becoming frustrated on June 16. Defendant gave a videotaped statement to police in which he admitted shaking Anthony. At trial, defendant testified that statement was a lie, told because police told him that if defendant told police he unintentionally shook Anthony, it would be a reasonable story to tell the prosecutor. Defendant testified the statement was what police told him to say. Police asked defendant about possible causes of Anthony's injuries, and defendant told them that a friend had picked Anthony up at a grocery store and slipped, causing Anthony's head to hit a railing. Defendant testified that after that incident, he thought Anthony was unharmed and did not take him to a doctor.

¶ 20 The trial court agreed to instruct the jury on involuntary manslaughter, but refused the defense's request to instruct the jury on the definition of recklessness. Following closing

arguments, the jury returned a verdict of guilty of involuntary manslaughter. The court sentenced defendant to 13½ years' imprisonment.

¶ 21    This appeal followed.

¶ 22                                ANALYSIS

¶ 23    Defendant argues the trial court committed reversible error in refusing to give the jury Illinois Pattern Jury Instructions, Criminal, No. 5.01 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 5.01) defining recklessness. Defendant argues that refusing to instruct the jury on the definition of recklessness was reversible error because the jury may have confused recklessness with ordinary negligence, and the evidence was closely balanced. Defendant also argues that the trial court erred in refusing to conduct a *Frye* hearing to determine the admissibility of evidence of SBS, therefore his conviction should be reversed and the cause remanded for a new trial or, alternatively, the cause should be remanded for a *Frye* hearing.

¶ 24        1. The Trial Court Did Not Commit Reversible Error by Refusing to Instruct the Jury on
                            the Definition of Recklessness

¶ 25    The trial court gave the jury Illinois Pattern Jury Instructions, Criminal, No. 7.07 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 7.07). IPI Criminal 4th No. 7.07 states: "A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual [without lawful justification] by acts which are performed recklessly and are likely to cause death or great bodily harm to another." The Committee Note to IPI Criminal 4th No. 7.07 states: "Give Instruction 5.01, defining the word 'recklessness.' " IPI Criminal 4th No. 7.07, Committee Note.   IPI Criminal 4th No. 5.01 states as follows: "A person [(is reckless) (acts recklessly)] when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

¶ 26    Defendant requested the trial court give the jury IPI Criminal 4th No. 5.01, but the court refused. Defendant argues that without a definition of recklessness, the jury had no basis to determine what recklessness was under the law. Defendant also argues that the failure to define recklessness, coupled with the State's description of reckless conduct in closing argument, confused the jury as to the meaning of recklessness and, thereby, rises to the level of reversible error.

¶ 27    "A reviewing court will reverse a trial court's determination as to what instructions to give only if it finds that the trial court abused its discretion. [Citation.] In making this determination, we are to examine whether the instructions given, when taken as a whole, fairly, fully and comprehensively apprised the jury of the relevant law." *People v. Gilliam*, 2013 IL App (1st) 113104, ¶ 41. The instructions accurately convey the applicable law when the instructions "convey to the jurors the law that applies to the facts so they can reach a correct conclusion." *People v. Sargent*, 239 Ill. 2d 166, 191 (2010). "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them [citation]." *People v. Herron*, 215 Ill. 2d 167, 187-88

(2005). Where a word or phrase is self-defining or commonly understood, the failure to define the term during jury instructions is not reversible error. *People v. Delgado*, 376 Ill. App. 3d 307, 314 (2007).

¶ 28    In this case defendant argues that *de novo* review is appropriate because the instructions the trial court gave to the jury did not accurately convey the applicable law, in that the instructions failed to define a term that does not have a plain meaning within the common juror's understanding. *People v. Velez*, 2012 IL App (1st) 101325, ¶ 26 ("While the giving of jury instructions is generally within the discretion of the trial court, we review *de novo* the question of whether the jury instructions accurately conveyed the applicable law to the jury."). But defendant does not argue that the trial court committed reversible error simply because the Committee Note states that IPI Criminal 4th No. 5.01 is to be given with IPI Criminal 4th No. 7.07. Defendant argues the jury may have thought that recklessness for purposes of involuntary manslaughter meant ordinary negligence and erroneously convicted him without having found his conduct was reckless. We will review the question of whether IPI Criminal 4th No. 7.07, without the accompanying IPI Criminal 4th No. 5.01 defining recklessness and in light of the State's closing argument, is an accurate statement of the law of involuntary manslaughter *de novo*.

¶ 29    This court has found that " 'recklessness' may be commonly understood by a lay person to mean ordinary negligence." *People v. Howard*, 232 Ill. App. 3d 386, 392 (1992). In *People v. Hopp*, 209 Ill. 2d 1, 7 (2004), our supreme court noted that "[t]he user's guide to IPI Criminal 4th states, '[i]f a Committee Note indicates to give another instruction, that is a mandatory requirement.' [Citation.]" *Hopp*, 209 Ill. 2d at 7 (citing IPI Criminal 4th, User's Guide, at VIII). Our supreme court found, therefore, that the trial court in *Hopp* had erred in failing to give the instruction required by the Committee Note. *Hopp*, 209 Ill. 2d at 7. In *Hopp*, the Committee Note stated that the court "must" give the instruction described in the note. *Hopp*, 209 Ill. 2d at 7. Our supreme court, however, did not rely on the mandatory language in the note to find that the trial court erred in failing to give the instruction. *Id*. Instead it relied on the statement in the User's Guide, which only requires an instruction to "indicate" the giving of another instruction.[2] IPI Criminal 4th, User's Guide, at VIII; *Hopp*, 209 Ill. 2d at 7. Thus, we read *Hopp* to make the Committee Note to IPI Criminal 4th No. 7.07, stating to give IPI Criminal 4th No. 5.01, a mandatory requirement. Accordingly, under *Hopp*, we hold the trial court in this case erred when it denied defendant's request to give the jury IPI Criminal 4th No. 5.01.

¶ 30    Our inquiry does not end there, however.

"Automatic reversal is only required where the error is deemed 'structural,' *i.e.*, a systemic error that serves to erode the integrity of the judicial process and undermine

---

[2]"If a Committee Note indicates to give another instruction, that is a mandatory requirement. Other times, the Committee Note will inform the user that another instruction should also be given, but only under the circumstance described, or that the user should see another instruction or Committee Notes for informative definitions, references, cases, and background." IPI Criminal 4th, User Guide, at VIII-IX. The User Guide also states, "Other instructions define certain words used elsewhere in the instructions. These definitions should be given following the instruction in which the defined word is used." *Id*. at VIII.

the fairness of a trial. [Citation.] The category of structural errors is very limited. In *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court considered whether a jury instruction that omitted an element of the offense constituted structural error. The Court found that it did not, noting that such errors are those that affect the framework within which a trial proceeds, rather than simply an error in the trial process itself. Such errors, the Court stated, deprive defendants of basic protections without which a criminal trial cannot reliably serve its function to determine guilt or innocence. Errors that the Court has found to be structural include the complete denial of counsel, trial before a biased judge, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, denial of a public trial, and defective reasonable doubt instructions." *People v. Washington*, 2012 IL 110283, ¶ 59.

¶ 31    "In contrast, instructional errors are deemed harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." *Washington*, 2012 IL 110283, ¶ 60. The trial court's error in this case, in failing to instruct the jury as to the definition of recklessness, did not affect the framework within which the trial proceeded, but was instead simply an error in the trial process itself. The court's error is, therefore, subject to a harmless error analysis. *Id*.; *People v. Rivera*, 251 Ill. App. 3d 375, 380-81 (1993) (where defendant claimed attempted murder instruction improperly defined murder in that the attempted murder instruction did not limit the definition of murder to acts committed with the specific intent to kill, the court found the error was harmless where our supreme court had held that: where intent to kill is evident from the facts, an erroneous attempted murder instruction is harmless) (citing *People v. Leger*, 149 Ill. 2d 355 (1992)).

¶ 32    An instructional error is harmless beyond a reasonable doubt where the evidence in support of the verdict is so clear and convincing that the verdict would not have been different had the jury been properly instructed. *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003); *People v. Furdge*, 332 Ill. App. 3d 1019, 1032 (2002). We hold that the trial court did not commit reversible error in not instructing the jury on the definition of recklessness because evidence of defendant's recklessness is so clear and convincing that the verdict would not have been different had the jury received the definition of recklessness. Defendant argues that the evidence is not clear and convincing because the evidence was closely balanced on the question of whether defendant recklessly or negligently caused Anthony's death. Defendant characterizes the evidence as "a battle of the scientific experts" on the question of whether Anthony's injuries resulted from defendant shaking Anthony violently and then throwing him down into a bassinet or by some other cause.

¶ 33    As it pertains to defendant's claim the jury was not properly instructed on the definition of recklessness, the question is not whether the evidence of the cause of death is closely balanced. To convict defendant of involuntary manslaughter, the State first had to prove beyond a reasonable doubt that Anthony performed the acts which resulted in Anthony's death. Illinois Pattern Jury Instructions, Criminal, No. 7.08 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 7.08). We must decide whether the outcome of the trial would have been different had the trial court also instructed the jury on the definition of recklessness. That is, would the verdict have been different if the court had instructed the jury that defendant's performance of the acts which resulted in Anthony's death had to have been in conscious disregard of a substantial and unjustifiable risk that Anthony's death would follow, and that

defendant's disregard of that risk constituted a gross deviation from the standard of care which a reasonable person would exercise in the situation. IPI Criminal 4th No. 5.01. The specific question before this court presumes that Anthony performed the acts which caused the death of Anthony. IPI Criminal 4th Nos. 7.07, 7.08. The only remaining issue is whether the jury would have found those acts were done recklessly had it been properly instructed. Thus, the proper question is whether evidence of defendant's recklessness in causing Anthony's death is closely balanced.

¶ 34　　To avoid any doubt, we find that evidence that defendant performed the acts that resulted in Anthony's death is not closely balanced. Regardless, for purposes of the issue on appeal, we hold that the evidence of defendant's recklessness is clear and convincing. "In general, a defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur." *People v. DiVincenzo*, 183 Ill. 2d 239, 250 (1998). "Whether a defendant acted knowingly or recklessly may be inferred from circumstantial evidence, and inferences as to defendant's mental state are a matter particularly within the province of the jury." (Internal quotation marks omitted.) *People v. Schmidt*, 392 Ill. App. 3d 689, 702 (2009).

¶ 35　　In this case, defendant gave a statement in which he said that he shook Anthony several days, including Friday, June 16, 2006. When defendant shook Anthony, his head was "flopping around." Defendant also stated that he pushed Anthony down on Monday and Tuesday of that week. Defendant initially denied he shook Anthony on June 16. Defendant later admitted he did shake Anthony on June 16 in the same manner as he had on the previous Monday and Tuesday. On those prior occasions, defendant was aware that when he shook Anthony the baby almost lost consciousness. Defendant stated he felt he should not do it again to avoid doing any further damage. When defendant initially denied shaking Anthony on Friday, he stated "that's another reason why I know I didn't shake him Friday because I was afraid that he would–he would go unconscious." On those prior occasions, defendant described Anthony's head "like all the air went out of a balloon." Defendant stated that on Friday "I lifted him *** and I shook him."

¶ 36　　Defendant's statements indicate he was aware of the serious risks of shaking a baby. Defendant's statement evinces a subjective fear that if he shook Anthony the baby would go unconscious. Defendant stated "all during that week I had that on my mind as far as not to damage him any further then what I did so, I would have to say um–Monday or Tuesday was the very last–last time that I did something harsh to him as far as shaking him and stuff." Defendant stated "I didn't want to repeat the same thing that I did Monday and Tuesday because I know you're not supposed to shake the baby." Despite this knowledge and defendant's own fear, the evidence was sufficient to permit a reasonable juror to find that defendant did shake Anthony again on June 16, 2006. In his statement, defendant told police, "I didn't want to do what I did on that Monday and Tuesday that I told you about and here I go I did it again [Friday]."　Defendant stated that on Friday, "It was the same shake," which he described as "consistent" with Monday and Tuesday. On Friday, defendant stated, after he shook Anthony, defendant had the baby with the baby's head "leaning off my knee," then defendant "yanked him up, head–head not supported 'cause I had both of his arms."

¶ 37　　Defendant also testified at trial he knows you are not supposed to shake a baby. At trial, defendant testified he did not shake or do any physical act toward Anthony on June 16, or on

the preceding Monday or Tuesday. Defendant attempted to explain that he lied when he stated he shook Anthony because police told him doing so would benefit him. The defense played a videotape of that conversation between defendant and police in open court. The jury had to determine whether defendant's confession prior to trial, or his explanation of that statement at trial, was more credible. Defendant's own contradictory testimony is not enough to render the evidence of defendant's recklessness closely balanced. Defendant's testimony that he lied because police convinced him it would benefit him with the State's Attorney is belied by evidence that defendant both admitted to police that "something happened" to Anthony earlier in the week and defendant's testimony on cross-examination that he told Anthony's mother that he had shaken Anthony on June 12 and June 13, 2006, the Monday and Tuesday prior to Friday, June 16, 2006, before police ever told him about the State's Attorney. Defendant attempted to explain that Anthony's mother understood that he meant that he rocked Anthony, and that he was attempting to convey to police that earlier in the week, "I might have rocked him too fast." At trial, defendant denied doing anything physical to Anthony at all. Defendant testified that he told doctors "I didn't do anything to my baby."

¶ 38 This is not a case where the jury had to choose between competing theories relative to defendant's state of mind when he performed the acts which caused Anthony's death, thus the evidence was not closely balanced. See *People v. Hammonds*, 409 Ill. App. 3d 838 (2011) (distinguishing *People v. Evans*, 369 Ill. App. 3d 366, 376 (2006) (finding evidence closely balanced where "the verdict was based primarily upon a credibility determination of the competing theories testified to by the parties' respective experts")). As we have stated, the only issue we must resolve to determine whether the trial court properly instructed the jury is whether the jury would have found defendant performed the acts which caused Anthony's death recklessly had it received an instruction on the definition of recklessness. Defendant's denial he performed the acts does not render the evidence that if and when he did perform those acts, he did so knowing the risk and consciously disregarding it, closely balanced. The jury had to assess defendant's credibility on the stand when he said he lied about shaking Anthony to help himself. The need for this assessment did not make the evidence that he did shake Anthony and that when he did, he did so recklessly, "closely balanced." *Id*.

¶ 39 Finally, the prosecutor's closing argument did not exacerbate the trial court's error to such a degree to raise the failure to properly instruct the jury to reversible error in this case. Defendant complains that the State improperly remarked to the jury that involuntary manslaughter involves "reckless, like shooting in the air, and, oops, I accidentally hit someone."

¶ 40 "As legal concepts, recklessness and accident are not synonymous. Recklessness requires a conscious awareness of a substantial risk of harm and a disregard of that risk. While an accident may result from negligence, mere negligence is not recklessness." *People v. Gutirrez*, 205 Ill. App. 3d 231, 264 (1990). An accident is not to be equated with recklessness, doing so is a misstatement of the law and potentially prejudicial, and an argument calculated to so mislead the jury can be grounds for reversal. *People v. Hoover*, 250 Ill. App. 3d 338, 351 (1993); *Gutirrez*, 205 Ill. App. 3d at 264-65.

¶ 41 "If *** defendant was responsible for [Anthony's] death, whether [his] responsibility was based upon carelessness or recklessness was crucially important to a finding of criminal liability ***." *People v. Buckley*, 282 Ill. App. 3d 81, 90 (1996). Nonetheless, even with this

improper comment before the jury, the evidence of defendant's recklessness is so evident from the facts adduced at trial that the result would have been no different with a proper instruction. In *Buckley*, the court held that it could not say with a reasonable degree of certainty that the improper equating of recklessness and carelessness did *not* contribute to the defendant's guilty verdict. *Id*. There, the court found that evidence of the cause of death and whether the defendant acted recklessly was closely balanced. *Id*. at 88.

¶ 42 We have found neither contested issue in this case, *i.e.*, whether defendant performed the acts resulting in Anthony's death and whether he performed them recklessly, to be closely balanced. See also *Gutirrez*, 205 Ill. App. 3d at 265 ("We base our decision on the following factors, which, taken as a whole, convince this court that the prosecutor's comments did not, in actuality, constitute a material factor in defendant's conviction, without which the jury might have reached a different result. First, we note that both the nature and the amount of evidence supporting the jury's verdict were clear, convincing and overwhelming. Secondly, the jury was well instructed on involuntary manslaughter, including the legal definition of recklessness."). We reach this conclusion in this case despite the fact the trial court failed to define recklessness. Compare *Gutirrez*, 205 Ill. App. 3d at 265. The *Gutirrez* court refused to reverse the defendant's conviction in that case in the face of "a calculated and persistent attempt to mislead the jury and to confuse their understanding of the legal theory underlying involuntary manslaughter." *Id*. at 264.

¶ 43 Here, defendant does not complain of persistent attempts to present the concept of recklessness as equivalent to an accident, nor did the complained-of argument indirectly suggest that the jury should convict defendant even if his conduct was merely accidental. Defendant has complained of only one comment by the State, and, as defendant concedes, the State argued that defendant shook Anthony with knowledge, and not accidentally. In this case, we cannot say that the State's sole complained-of comment contributed to defendant's guilty verdict for involuntary manslaughter or that the jury could have reached a contrary verdict had the improper comment not been made. Compare *Buckley*, 282 Ill. App. 3d at 90. In *Howard*, the defense argued the failure to define the mental state of recklessness was prejudicial error "since many jurors may have thought that recklessness meant ordinary negligence and therefore they chose murder, the only alternative." *Howard*, 232 Ill. App. 3d at 391. The jury found the defendant guilty of murder. *Id*. at 387. The *Howard* court agreed that "[a] juror, concluding that the defendant's acts were more than negligent, may have chosen murder." *Howard*, 232 Ill. App. 3d at 392. The court held that "the improper closing remarks of the prosecutor, referring to involuntary manslaughter as a 'cop-out,' and the failure of the court to define the mental state of recklessness for the jury constituted reversible error." *Id*. at 392-93.

¶ 44 We decline to follow *Howard* in this case. First, the *Howard* court specifically limited its decision to the facts of that case. *Howard*, 232 Ill. App. 3d at 392-93 ("Based upon the specific facts in this case, we find that the improper closing remarks of the prosecutor *** and the failure of the court to define the mental state of recklessness for the jury constituted reversible error."). Moreover, *Howard* is distinguishable and compels a different result in this case. In *Howard*, the court found the evidence was closely balanced. *Id*. at 392. Here, as discussed above, the evidence of defendant's recklessness is not closely balanced. Instead, the evidence that if defendant performed the acts which caused Anthony's death–the answer

to which must be presumed to reach the question of whether the jury would have reached a different verdict had it been properly instructed–he did so recklessly, is overwhelming. Defendant made statements suggesting his own subjective knowledge of the risk to Anthony, his fear that he had harmed Anthony before June 16, and that he disregarded the risk of doing so again by repeating his previous acts. Unlike *Howard*, the central issue in this case was not defendant's state of mind in committing the fatal acts, but whether or not defendant performed the acts which led to Anthony's death. An additional instruction, defining "recklessness" would not have changed the outcome of the case. *Howard*, 232 Ill. App. 3d at 391-92. Accordingly, the trial court's error in failing to do so was harmless beyond a reasonable doubt.

¶ 45       2. The Trial Court Did Not Err in Refusing to Hold a *Frye* Hearing on the
                  Admissibility of Evidence of Shaken Baby Syndrome

¶ 46       Next, defendant argues the trial court committed reversible error in failing to hold a *Frye* hearing on the admissibility of evidence of SBS. Defendant claims that given "fierce disagreement" in the medical community as to the legitimacy of the SBS diagnosis, "it is difficult to imagine how the diagnosis can ever be deemed 'generally accepted' under *Frye*."

> "The 'general acceptance' test set forth in *Frye* provides that scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs. [Citations.] The trial court may determine whether the scientific principle or methodology meets the general acceptance test in either of two ways: (1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject. [Citation.]" (Internal quotation marks omitted.) *People v. Armstrong*, 395 Ill. App. 3d 606, 625 (2009).

¶ 47       This court reviews a claim that the trial court erred in failing to hold a *Frye* hearing, and that the erroneously admitted evidence would not satisfy the general acceptance test, *de novo*. *People v. Luna*, 2013 IL App (1st) 072253, ¶ 49 (citing *In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004)). Defendant argues that under our supreme court's decision in *People v. McKown*, 226 Ill. 2d 245, 275 (2007), the trial court erred in taking judicial notice of the general acceptance of SBS as a medical diagnosis because no *Frye* hearing has ever been held in Illinois to determine if the diagnosis enjoys general acceptance. Defendant also argues that the trial court erred in following this court's decision in *Armstrong*, 395 Ill. App. 3d at 625, and allowing SBS expert testimony without first holding a *Frye* hearing.

¶ 48       We agree with the trial court's ruling that *Frye* is not implicated by the State's experts' opinions in this case. Accordingly, the court did not err in declining defendant's request for a *Frye* hearing. "Under the general acceptance test of *Frye*, scientific evidence is admissible if the methodology underlying the opinion is sufficiently established to have gained general acceptance in the particular field in which it belongs. [Citation.] The focus of this test is on the underlying methodology of the opinion and not the ultimate conclusion." (Internal quotation marks omitted.) *Donnellan v. First Student, Inc.*, 383 Ill. App. 3d 1040, 1057 (2008). The threshold issue is whether the State's experts' testimony is scientific evidence

subject to the *Frye* standard. *McKown*, 226 Ill. 2d at 254 ("Because *Frye* applies only to scientific evidence, we first must determine whether the results of HGN testing are scientific evidence subject to the *Frye* standard.").

¶ 49    In *McKown*, the defendant challenged the horizontal gaze nystagmus (HGN) test as a methodology to reach the conclusion that an individual is impaired by alcohol. *Id.* at 255. There was no dispute as to the scientific principle underlying the HGN test, *i.e.*, that alcohol consumption can cause nystagmus. *Id.* The defendant's contention of the dispute between proponents and critics of the HGN test as an indicator of impairment was based on writings finding that positive HGN test results can be caused by factors other than alcohol and evidence that the HGN test was not developed to measure whether a person was impaired, but was developed to measure blood-alcohol content. *Id.* at 273-75.

¶ 50    In *McKown*, the issue was the use of a test to reach a definite conclusion–that a person is impaired by alcohol. The defendant presented evidence of a lack of general acceptance of that test as a reliable indicator of alcohol impairment. *McKown*, 226 Ill. 2d at 275. In this case, the methodology the experts used to reach their conclusions as to what caused Anthony's injuries was not a test or a new or novel methodology, but their medical training and experience. Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence. *People v. Swart*, 369 Ill. App. 3d 614, 631 (2006).

¶ 51    Defendant does not challenge the State's experts' medical qualifications. The State's experts testified that the cause of Anthony's death was subdural hematoma and that, based on what they observed, those injuries resulted from blunt trauma which exerted severe forces on his brain. The jury heard conflicting opinions as to what caused Anthony's injuries. To the extent the State's experts opined that Anthony was shaken (although we note not inconsequentially that the experts actually testified that Anthony's injuries were *consistent* with shaking and Dr. Flaherty specifically denounced saying Anthony was shaken), those opinions were based on their conclusions reached after an application of their medical training to their observations. Dr. Humilier performed Anthony's autopsy. Dr. Flaherty testified that she saw Anthony in the pediatric intensive care unit and that she relied on hospital reports, multiple CT's and MRI's, and reports by an ophthalmologist, radiologist, and neuroradiologist in forming her opinions. Defendant does not challenge the medical methodology the experts actually relied upon to reach their conclusions. Defendant's challenge is to the conclusion itself.

¶ 52    The jury also heard conflicting evidence as to whether shaking alone could produce the forces necessary to cause Anthony's injuries without necessarily producing other visible injuries. The State's expert testified that other injuries do not necessarily result from the type of shaking that could have caused Anthony's injuries. Dr. Humilier explained the basis for his opinion was that "the baby's brain is very soft and very filled with water, unlike an adult's brain. *** [S]o it is very easy for any type of [blunt] trauma to the head to cause tearing of the veins and causing that subdural blood." The State's expert's opinion was not based on a "theory of Shaken Baby Syndrome" or any new or novel scientific theory. The State's expert's opinion was based on medical knowledge and experience. Any contrary testimony only goes to the weight of the opinion. Unlike *McKown*, this is not an instance where a methodology was employed to reach a particular conclusion–in this case the cause of

Anthony's death. Neither of the State's experts actually "diagnosed" Anthony with SBS. Nor is SBS, had it been diagnosed, a "methodology." Rather, it is a conclusion that may be reached based on observations and medical training which is not new or novel. "If the underlying method used to generate an expert's opinion is reasonably relied upon by the experts in the field, the fact finder may consider the opinion–despite the novelty of the conclusion rendered by the expert." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 77 (2002) (*overruled on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004)). Accordingly, a *Frye* hearing was not required. *Donnellan*, 383 Ill. App. 3d at 1057.

¶ 53    Based on the facts of this case, we hold that no error occurred because a *Frye* hearing was not necessary. See also *Johnson v. State*, 933 So. 2d 568, 570 (Fla. Dist. Ct. App. 2006) (a *Frye* hearing was not required because the identification of SBS as the cause of the infant's death was an expert opinion based on the medical examiner's personal training and experience; "[a]n expert opinion based on personal training and experience is not subject to a *Frye* analysis").

¶ 54                                    CONCLUSION

¶ 55    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 56    Affirmed.