2019 IL App (1st) 150628-U

No. 1-15-0628

Order filed December 13, 2019

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 15069 |
| | ) | |
| CHRISTOPHER TAYLOR, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:  This court affirmed defendant's first degree murder conviction where: the evidence proved beyond a reasonable doubt that at the time of the shooting defendant intended or knew his acts would kill or cause great bodily harm to the victim; no evidentiary errors were committed by the trial court; and defense counsel was not ineffective. The statutory 25-year mandatory firearm enhancement was not unconstitutionally vague.

¶ 2     Defendant Christopher Taylor was charged by indictment with multiple counts of first degree murder in connection with the death of Derico Fitch (Rico). A jury found defendant guilty

of first degree murder, and he was sentenced to a term of 25 years' imprisonment for first degree murder and a consecutive 25-year term for personally discharging a firearm that caused Rico's death. Defendant appeals his conviction and sentence.

¶ 3     On appeal, defendant contends as follows: (1) his first degree murder conviction must be reduced to involuntary manslaughter; (2) the State's use of impermissible hearsay in a video-recorded interview denied defendant a fair trial; (3) defendant was denied his constitutional right to confront the witnesses against him; (4) defense counsel was ineffective for failing to request a jury instruction on the mental state of knowledge; (5) the State's closing argument denied defendant a fair trial; (6) the 25-year mandatory firearm enhancement was unconstitutional; and (7) defendant's sentence was excessive.

¶ 4                                    BACKGROUND

¶ 5     The circumstances surrounding Rico's death in the early morning hours of June 20, 2007, are largely undisputed; defendant admitted that he had a gun in his possession, and the gun discharged killing Rico.

¶ 6                              I. Pretrial Proceedings

¶ 7     Defendant filed several motions *in limine*, two of which are at issue in this appeal.

¶ 8                            A. Video-Recorded Interview

¶ 9     Defendant moved to have the jury view only the redacted version of the video recording of his interview with assistant State's Attorney Nick D'Angelo (ASA D'Angelo) on the ground that during the interview, the ASA referred to statements by the eyewitnesses and other individuals that might have been false or never made. The trial court denied the motion, finding the ASA's statements were a proper interrogation tactic and to redact them would remove their context and

render defendant's interview nonsensical to the jury. The court rejected defense counsel's alternative request that the jury be instructed that they were not to consider the statements as evidence and that the statements might contain inaccurate and intentional misstatements but agreed to instruct the jury that the statements by other individuals referred to by ASA D'Angelo were not evidence.

¶ 10                                B. Confrontation Clause

¶ 11     Defendant filed a motion *in limine* seeking to bar the testimony of Dr. Eimad Zukariya, an assistant Cook County medical examiner. Dr. Zukariya reviewed the reports prepared by Dr. Valerie Arangelovich, the assistant Cook County medical examiner who performed the 2007 autopsy on Rico's body. Dr. Arangelovich was no longer employed in the Cook County medical examiner's office. Defendant asserted that in order to disprove the State's intentional murder theory he needed to cross-examine the medical examiner who performed the autopsy. He maintained that having a medical examiner who only reviewed the reports testify violated his constitutional right of confrontation. The trial court denied the motion finding that Dr. Zukariya's testimony was nontestimonial in nature.

¶ 12                                II. Jury Trial

¶ 13     The relevant trial testimony is summarized below.

¶ 14                                A. For the State

¶ 15                                1. *Duane Jeffrey F. Smith*

¶ 16                                a. Direct Examination

¶ 17     Duane Jeffrey F. Smith (Duane) and Devon Patton (Devon) were childhood friends and friends of Rico. Duane was acquainted with defendant who was Devon's cousin.

¶ 18 Just after midnight on June 20, 2007, Duane, Devon and defendant were at Devon's uncle's house on Lincoln Avenue, in Harvey. The three men were talking in the garage when Rico arrived. Rico and defendant began to argue loudly enough that the group was asked to move. Devon and Duane followed Rico across the street to the Lincoln Medical Center parking lot. Defendant walked across the street but at an angle away from the group. Duane's attention was on Rico because he wanted to find out what the argument was about, and he lost sight of defendant. When defendant returned to the group, he seemed quiet, but he got loud again as Rico and he continued their argument.

¶ 19 Devon and Duane attempted to keep the argument between Rico and defendant from becoming physical. As defendant approached Rico, Devon pushed defendant, and Duane jumped in front of Rico. Rico pushed Duane out of the way, turning on an angle, and defendant pushed Devon away. Duane heard a shot and saw defendant holding a gun. Duane began to run, afraid that defendant was going to shoot Devon or him. He went about five feet and then turned back to where Rico had fallen. Duane saw defendant run toward Lincoln Medical Center. Duane did not see him drop the gun and did not know what he did with it.

¶ 20 While calling the police, Duane used a shirt to try to stop the bleeding from Rico's wound. After the police and an ambulance arrived, Devon and Duane accompanied a police officer to Rico's house to inform Rico's family what had occurred. After returning to the scene, Devon and Duane were placed in a squad car and driven to the Harvey police station. Duane did not know where defendant was at that time. At the police station, Duane was separated from Devon and placed in an interview room. During an interview with a detective, Duane stated that defendant

shot Rico. In a videotaped interview, Duane repeated that defendant shot Rico. He did not see the gun until after the shot was fired. Defendant was the only person Duane saw with a gun.

¶ 21                                    b. Cross-Examination

¶ 22    According to Duane, Rico and defendant argued about Rico's criticism of the group's failure to take security precautions. At one point, Rico and defendant took their shirts off to fight. After Devon and Duane returned to where Rico had fallen, defendant returned and told Duane to remove his shirt so that defendant and Duane could apply pressure to Rico's wound.

¶ 23                                    2. *Devon Patton*

¶ 24                                    a. Direct Examination

¶ 25    At the time of defendant's trial, Devon was on parole for an armed robbery conviction from the State of Michigan.

¶ 26    On June 20, 2007, defendant and Devon were standing in front of his uncle's house when they were joined by Duane. The group was socializing when Rico arrived asking why they were "slipping," meaning they were not paying attention to their surroundings. At first Rico directed his comments to the group, but it turned into an argument between defendant and Rico. The argument grew so loud that the group was asked to move away from the house. They crossed the street to the parking lot of the Lincoln Medical Center.

¶ 27    After crossing the street, defendant and Rico continued to argue loudly. Duane and Devon tried to keep them apart so they would not get into a physical altercation, but neither man would calm down. Defendant removed his shirt, but Rico did not remove any of his clothing. Devon was holding Rico, who told him he was fine and to let him go. Devon then went over to defendant telling him to calm down and holding his arms. Defendant shoved Devon away and faced Rico.

As Devon turned around, he saw defendant with a gun; his elbows were bent, and the gun was pointed forward. Devon heard a shot and ran back toward his uncle's house. He tried but failed to gain admittance to the house or to the house next door. As Devon waited on the side of the house, he did not see defendant.

¶ 28    Devon returned to where Rico had fallen; Duane was trying to apply pressure to the gunshot wound. Rico was wearing a hoodie over two shirts, so it was hard to tell where the blood was coming from. Neither Duane nor Devon had a gun that night, and Devon did not see Rico with a gun.

¶ 29    After the police and the ambulance arrived, a police officer took Duane and Devon to Rico's house to tell his family what had occurred. When they returned to the scene, Devon saw defendant talking to police officers. He heard defendant tell the officers that someone had walked up and shot Rico. Devon was taken to the police station where he was interviewed by the police and gave a videotaped statement. He was then released.

¶ 30                            b. Cross-Examination

¶ 31    According to Devon, defendant removed his shirt, but Rico did not take his clothes off. Devon admitted he had been drinking and thought he was intoxicated. Rico did not appear to be intoxicated. Devon did not remember asking Rico if he was intoxicated. When Rico was arguing with the group, everyone thought he was kidding.

¶ 32    Devon denied that he was distracted by the commotion resulting from the continuing argument or by Rico shouting to the occupants of a van as it drove by. Devon acknowledged that defendant was not extending his arm forward pointing the gun at Rico.

3. *Eimad Zukariya, M.D.*

¶ 33    At the time of trial, Dr. Zukariya was an assistant medical examiner in the Office of the Cook County Medical Examiner. Over defendant's objection, the trial court qualified Dr. Zukariya as an expert in the field of forensic pathology.

¶ 34                                a. Direct Examination

¶ 35    In 2015, Dr. Zukariya reviewed records of the June 20, 2007, autopsy performed on Rico's body by Dr. Arangelovich. According to the autopsy report, an external examination of the body revealed a number of abrasions and two gunshot wounds. The first gunshot wound was on the right side of the chest below the nipple. There was stippling around the wound indicating that the range of fire was two to three feet from the body, and the course of the bullet was from front to back, left to right and then downward. The bullet passed through the skin and soft tissue of the right side of the chest striking the diaphragm on the right. It then struck the top of the liver, hit the middle and lower lobe of the right lung and struck the spleen before exiting the body between the tenth and eleventh ribs. There was an exit wound on the left side of the back. The wound caused a loss of 40% or two-fifths of the victim's blood.

¶ 36    The second gunshot wound was on the back of the left arm, above the elbow, where the bullet entered. It did not strike any bone matter as it traveled back to front, left to right and upwards. There was no stippling around the second gunshot wound. There was an exit wound as well.

¶ 37    Dr. Zukariya believed the bullet that exited from the first gunshot wound could not have caused both wounds for several reasons. First, the bullet exited the body at 20 and 1/2 inches from the top of the head and would have had to reenter the body 11 inches below the top of the head. Second, the bullet would have had a different entrance and exit path opposite to what the report showed. Third, the one bullet would have caused an atypical entry wound upon its second entry

because it would not be traveling in the same plane, *i.e.*, rotating. The second wound entry looked like a typical entry. Therefore, Dr. Zukariya did not believe the second gunshot wound resulted from a reentry of the first bullet.

¶ 38    Based on his review of the autopsy records and the photographs and within a reasonable degree of medical certainty, Dr. Zukariya opined that the cause of Rico's death was multiple gunshot wounds, and the manner of death was homicide.

¶ 39                              b. Cross-Examination

¶ 40    The toxicology report indicated that while Rico had stopped drinking earlier in the evening, he was still legally intoxicated at the time of his death. The number designation of the gunshot wounds did not relate to the order in which the wounds were inflicted.

¶ 41    Dr. Zukariya explained that he relied on the body measurements Dr. Arangelovich had taken. Had he performed the autopsy, he could have examined the internal organs to determine if the bullet had tumbled as it passed through the body. The doctor did not review any x-rays; those would have revealed fragments of the bullet if tumbling had occurred. Dr. Arangelovich's report did not mention any bullet fragments. The trajectory of the bullet as up or down in the body did not always relate to how the person was standing or moving when they were shot. Even if he had performed the autopsy himself, Dr. Zukariya would not have been able to tell how the bullet entered Rico's body. The doctor agreed that it would have been better to have been the individual performing the original autopsy. Making his own observations, taking the measurements and choosing which photographs to take would result in a more complete and accurate review. The doctor acknowledged that he was relying on Dr. Arangelovich's autopsy report and that the report was subject to the possibility of human error. There had been one clerical error in the report; an

exit wound was transcribed as an entrance wound. Dr. Zukariya agreed that Rico's clothing could have blocked the stippling effect from appearing on his skin.

¶ 42                              c. Redirect Examination

¶ 43    According to Dr. Zukariya, if Rico had been wearing a light tee shirt, the stippling could have been seen on his skin. His review of the autopsy photographs supported the measurements recorded by Dr. Arangelovich.

¶ 44                              d. Re-Cross-Examination

¶ 45    Dr. Zukariya acknowledged that to be certain of the actual measurement, it was necessary to have been present when the autopsy was performed. Mostly likely, any stippling would not have penetrated through a hoodie and two shirts.[1]

¶ 46                              4. *Manuel Escalante*

¶ 47                              a. Direct Examination

¶ 48    Prior to his retirement, Mr. Escalante was employed as a detective with the City of Harvey police department.

¶ 49     On June 20, 2007, Detective Escalante was dispatched to the scene of a shooting at the Lincoln Medical Center. He learned that there were three witnesses to the shooting; Duane, Devon and defendant. Arriving on the scene, Detective Escalante spoke with all three men prior to having them transported to the Harvey police station. Upon their arrival at the police station, defendant, Duane and Devon were separated and were unable to talk to or see each other.

---

[1] The autopsy report, People's Exhibit No. 29, was admitted into evidence at the close of the State's case.

¶ 50    At 3:30 a.m. on June 20, 2007, Detective Escalante interviewed defendant, who was not considered a suspect at that time. When asked what he witnessed at the scene of the shooting, defendant told the detective that a male individual, dressed in blue jeans and a white T-shirt came up to where Rico, Duane, Devon and he were standing. The individual, whose face was partially covered, displayed a handgun and shot Rico. Defendant thought the handgun was a blue-steel semiautomatic. The individual then ran from the scene in a northwest direction. The interview with defendant lasted 15 to 20 minutes. After Detective Escalante conducted separate interviews with Duane and Devon, defendant became a suspect in Rico's death.

¶ 51    Around 3 p.m. on June 20, 2007, defendant was placed in the "green room" of the detective area. The room contained sofas, a television set and a drinking fountain. Defendant was not handcuffed; he was fed and allowed to watch television. He remained there until 7 a.m. the next day. In the meantime, the area around the scene of the shooting was canvassed for the weapon used in the shooting and to locate additional witnesses. No witnesses came forward, and the weapon was never found.

¶ 52    By 8:30 a.m. on June 21, 2007, Detective Escalante had conducted second interviews with Duane and Devon. When the detective went to tell defendant he would be returned to the lockup, defendant asked what had happened to Duane and Devon. The detective responded that the investigation was ongoing. Defendant stated he wished to talk. Detective Escalante verbally advised defendant of his *Miranda* rights, and defendant was taken to an interview room, where a video camera was set up to record his statement. Detective Crocker was also present in the interview room. Detective Escalante advised defendant of his *Miranda* rights in writing. Defendant changed his version of the shooting and stated that he shot Rico.

¶ 53    Prior to the jury viewing the video recording of his interview with Detective Escalante, defendant renewed his objection to the recording being played for the jury. The trial court denied defendant's request to instruct the jury that Detective Escalante made intentional misstatements to him during the interview, but the court did instruct the jury that what the detectives said on the recording was not evidence. After the recording was played for the jury, defendant moved for a mistrial based on the improper information contained in the recording. The trial court denied the motion for mistrial.

¶ 54                                  b. Cross-Examination

¶ 55    Detective Escalante maintained that there was no communication between defendant, Duane and Devon at the Harvey police station. Other than the interviews, the detective did not discuss the case with defendant, until he stated he wished to talk to the detective.

¶ 56                                  5. *Nick D'Angelo*

¶ 57                                  a. Direct Examination

¶ 58    Beginning on the evening of June 21, 2007, and into the early hours of June 22, 2017, ASA D'Angelo conducted separate interviews with Duane and Devon as part of the investigation into Rico's death. He then conducted a video-recorded interview with defendant.

¶ 59    Over defendant's objection, the trial court allowed the State to present the unredacted video recording of ASA D'Angelo's interview with defendant. At the request of defendant, the trial court instructed the jury as follows:

> "[Y]ou will be watching and listening to a DVD recording of a conversation between [defendant] and Mr. D'Angelo. This recording is being played solely for the purpose of

showing what [defendant] said about the incident. What Mr. D'Angelo said is not evidence and must notten [*sic*] considered by you as any evidence in this case."

¶ 60                                     b. Cross-Examination

¶ 61    ASA D'Angelo did not discuss the case with defendant prior to the commencement of the recording. When the ASA finished asking questions, he stated that he was done, and the recording was stopped. ASA D'Angelo acknowledged that defendant continued speaking after the recording was turned off, saying something to the effect that he had not intended to shoot Rico.

¶ 62                                     6. *Nicole Fundell*

¶ 63                                     a. Direct Examination

¶ 64    Nicole Fundell, a forensic scientist specializing in firearm and tool mark examinations for the Illinois state police, was qualified by the trial court as an expert witness.

¶ 65    Ms. Fundell examined a cartridge case and a fired bullet that had been recovered from the scene of the shooting. The cartridge and the bullet could not have come from the same gun because they were of two different calibers. Ms. Fundell could not identify the model of the gun that the cartridge case was fired from though she could eliminate a Glock firearm because it had a different firing pin shape than the one on the fired cartridge case. She could not identify the model gun that the discharged bullet came from since the list of guns was too extensive. Ms. Fundell could eliminate Glock, Agent-K and Kahr firearms because they were designed with polygonal rifling, while the discharged bullet had cut-rifling.

¶ 66    Ms. Fundell was questioned about defendant's statement to ASA D'Angelo on the video recording that he used a "lemon squeezer" type of gun, which he maintained required only one pull on the trigger to fire two shots. Ms. Fundell explained that "lemon squeezer" was a nickname

given to the Smith & Wesson hammerless revolver. Pulling the trigger required more force than a single-action, but it would fire only one bullet for each pull of the trigger.

¶ 67                                    b. Cross-Examination,

¶ 68    While the recovered bullet was in good condition. Ms. Fundell could not determine how long either the bullet or the cartridge had been in the area before they were recovered. Smith & Wesson manufactured the "lemon squeezer" prior to World War II and then reintroduced it in the 1950's. If an individual referred to a firearm other than the Smith & Wesson hammerless revolver as a "lemon squeezer," the term meant something different to that person.

¶ 69                                    B. For the Defendant

¶ 70    Defendant waived his right to testify and did not call any witnesses.

¶ 71                                    C. Verdict and Posttrial Motions

¶ 72    The jury was instructed on both first degree murder and involuntary manslaughter. The jury deliberated and returned a verdict finding defendant guilty of first degree murder. Following argument, the trial court denied defendant's motion for a new trial.

¶ 73                                    III. Sentencing

¶ 74    At the sentencing hearing, the prosecutor pointed out that at age 18, defendant was convicted of home invasion, a Class X felony and sentenced to the Illinois Department of Corrections. The present offense took place when he was age 24, two years after he had completed the mandatory supervised release (MSR) portion of his sentence. The prosecutor pointed out that defendant was the only person at the scene armed with a gun, and even though his friends attempted to restrain him, he chose to use his weapon to settle what had only been a verbal argument. The

prosecutor requested that the trial court impose a sentence close to the maximum term for first degree murder.

¶ 75    Defense counsel pointed out that defendant never had a family life; by age three, he was in the custody of the Department of Children and Family Services (DCFS), and he lived in a series of group homes and with foster parents. His mother died, and he never met his siblings. After he was released from prison, he got a job and tried to support his daughter as well as help his girlfriend raise her two children. Defense counsel requested a 45-year sentence, which would demonstrate to defendant the serious nature of his actions and give him time to realize the harm he caused.

¶ 76    In sentencing defendant, the trial court stated that it took into consideration defendant's social history, especially the lack of a family life. The court recognized that in effect no one was raising defendant and teaching him, "as your counsel put it, how to act like a man, because you did not act like a man that day." The court also considered that defendant's conduct caused serious harm, and he had a history of prior criminality. The court found the sentence was necessary to deter others from committing the same offense. The trial court sentenced defendant to 25 years for first degree murder and imposed a consecutive 25-year firearm enhancement.

¶ 77    Defendant's motion for reconsideration of his sentence was denied. This timely appeal followed. [2]

¶ 78                                    ANALYSIS

¶ 79                          I. Sufficiency of the Evidence

_____

[2] This case was assigned to the authoring justice on September 13, 2018, but was not fully briefed until October 2, 2018. The disposition was first circulated to the panel members on November 14, 2019.

¶ 80    Defendant contends that his conviction for first degree murder must be reduced to involuntary manslaughter because the State failed to prove beyond a reasonable doubt that he intended to kill Rico or knew that his actions would result in Rico's death or great bodily harm to Rico. He maintains that the evidence established that his actions were reckless, and therefore, he was guilty of involuntary manslaughter, not first degree murder.

¶ 81                                A. Standard of Review

¶ 82    When reviewing a challenge to the sufficiency of the evidence, the reviewing court's function is not to retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69.  Rather, the court considers whether, "viewing the evidence in the light most favorable to the State, ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' (Emphasis in original.)" *Nere*, 2018 IL 122566, ¶ 69 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 83                                B. Discussion

¶ 84    "The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. "The mental state for murder is knowledge, while the mental state for involuntary manslaughter is recklessness." *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010).

¶ 85    A person knows or acts knowingly or with knowledge of: "(b) [t]he result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2006). "A person acts recklessly when he 'consciously disregards a substantial and unjustifiable risk that circumstances

exist or that a result will follow *** and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' " *Jones*, 404 Ill. App. 3d at 742 (quoting 720 ILCS 5/4-6 (West 2006)). In general, a person acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur. *DiVincenzo*, 183 Ill. 2d at 250. Typically, recklessness involves a lesser degree of risk than conduct that creates a strong probability of death or great bodily harm. *DiVincenzo*, 183 Ill. 2d at 250. "[R]ecklessness and knowledge are mutually inconsistent culpable mental states." *People v. Fornear*, 176 Ill. 2d 523, 531 (1997).

¶ 86     In this case, it is undisputed that defendant's discharge of the gun resulted in Rico's death. Only his mental state at the time of the shooting is at issue. Since direct evidence of a defendant's mental state is usually lacking, it may be inferred from the surrounding circumstances, including the character of the defendant's acts and the nature of the victim's injuries. *Jones*, 404 Ill. App. 3d at 744. The question of whether a defendant acted intentionally, knowingly or merely recklessly is generally a question for the trier of fact. *Jones*, 404 Ill. App. 3d at 744.

¶ 87     Defendant maintains that the uncontradicted evidence showed that Rico and he engaged in an alcohol-fueled argument initiated by Rico, that defendant displayed the gun in order to reassure Rico that the group would not be taken by surprise and that as Rico and he struggled for the gun it discharged one time. Defendant points out that he remained at the scene and attempted to aid Rico and consistently maintained that he did not intend to shoot Rico. He argues that these actions were further proof that he did not possess the mental state for first degree murder.

¶ 88     That defendant's mental state was one of knowledge rather than recklessness was supported by the autopsy report, which stated that Rico died of multiple gunshots, and Dr.

Zukariya's testimony explaining why Rico's injuries could only have been the result of two gun shots. In her testimony, Ms. Fundell, the expert in firearms, disputed defendant's claim that the gun he used fired two bullets for each trigger pull. She explained that a "lemon squeezer," the term defendant had used, was a nickname given to a Smith and Wesson revolver that took more effort to fire but still only discharged one bullet at a time.

¶ 89    The State's evidence as to defendant's mental state was not limited to the two-shot theory. There was other evidence, which if believed by the jury, established beyond a reasonable doubt that defendant's mental state at the time of the shooting was one of knowledge, not recklessness. Defendant was the only person at the scene armed with a gun. Defendant's claim that he was just showing the gun to Rico and that it discharged during a struggle is contrary to the testimony of Duane and Devon, who testified that prior to the shooting, they were trying to restrain defendant when he pushed them out of the way and approached Rico. Neither witness testified that defendant showed the gun to Rico nor that defendant and Rico struggled for the gun before it went off. While defendant argues that it is mere speculation on the State's part that Duane and Devon simply did not hear a second gunshot, neither witness was questioned as to how many gun shots they heard. Both witnesses ran a short distance from the scene after the first shot, and it is reasonable to infer that they were focused on their own safety, rather than how many shots were fired.

¶ 90    Defendant's claim that he remained at the scene to render aid to Rico after the shooting was contradicted by Duane's testimony that defendant initially fled the scene before returning to where Duane was ministering to Rico. As for defendant's claim that he consistently denied that he intended to kill Rico, it is undisputed that defendant initially told police that another individual approached the group and shot Rico. Defendant even provided a description of the shooter and the

type of gun the shooter used. Reviewing the evidence in the light most favorable to the State, there was more than sufficient evidence establishing beyond a reasonable doubt that defendant knew that his actions would result in death or great bodily harm to Rico.

¶ 91    Defendant relies on *People v. Collins*, 213 Ill. App. 3d 818 (1991). Similar to the present case, Mr. Collins and the victim had been drinking heavily at the time of the shooting and the State's theory of guilt was that two shots were fired. *Collins* is otherwise distinguishable from the present case. According to the eyewitness, Mr. Collins and the victim were on the floor struggling, and the victim was on top of Mr. Collins when the gun discharged. Mr. Collins attempted to revive the victim before realizing he was dead. He then called 911 to alert the police and requested an ambulance. Mr. Collins gave his name and address and admitted he and his friend were wrestling with the gun when it discharged. *Collins*, 213 Ill. App. 3d at 825.

¶ 92    Unlike the present case, in *Collins*, there was positive evidence that the gun discharged during a struggle, and Mr. Collins immediately acted to aid the victim and to identify himself to police. Further, unlike the present case, the physical evidence in *Collins* did not support the testimony that two shots were fired, which was critical to the State's theory in that case. While noting the weaknesses and contradictions in Mr. Collins' testimony, the reviewing court pointed out that the State still had the burden to prove a mental state sufficient for a conviction for first degree murder. *Collins*, 213 Ill. App. 3d at 825. The reviewing court reduced Mr. Collins' first degree murder conviction to second degree murder. *Collins*, 213 Ill. App. 3d at 827.

¶ 93    Defendant also relies on *People v. Ellis*, 107 Ill. App. 3d 603 (1982). In that case, Mr. Ellis and the victim had been drinking when Mr. Ellis ordered the victim out of his apartment. When the victim refused to leave, Mr. Ellis fired a warning shot. The victim lunged at Mr. Ellis, who

shot him in the head. The reviewing court found Mr. Ellis' version of the shooting that he fired the gun the first time to scare the victim and that he fired a second time when the victim came at him was not contradicted by the State's evidence. The lack of "tattooing" on the victim did not establish that the gun was fired from a distance which would have established intent. It could have resulted from a close-range discharge in which case the wound would have absorbed the gunpowder. While rejecting Mr. Ellis' self-defense claim, the reviewing court reduced his first degree murder conviction to voluntary manslaughter. *Ellis*, 107 Ill. App. 3d at 612.

¶ 94    Other than an alcohol-fueled argument, the facts in *Ellis* distinguish it from the present case. The evidence supported Mr. Ellis' description of the events leading to the victim's death, *i.e.*, the warning shot and the struggle for the gun, and was not contradicted by the State's evidence. Moreover, like Mr. Collins, Mr. Ellis' conduct after the shooting was consistent with his lack of intent in shooting the victim; he immediately roused his neighbors telling them a man had been shot and asked for help to save his life. *Ellis*, 107 Ill. App. 3d at 606. That contrasts with the behavior of defendant in the present case who initially fled the scene and then returned to the scene to help Devon stop Rico's bleeding and later claimed to police that Rico had been shot by an unknown assailant.

¶ 95    This court must reverse a conviction where, after reviewing the evidence and giving due consideration to the fact that the trial court had the opportunity to see and hear the witnesses, we are of the opinion that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt. *Jones*, 404 Ill. App. 3d at 744. In the present case, after viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant's conduct in shooting Rico established that he knew his acts would result in death or

great bodily harm to Rico. We conclude that defendant was found guilty of first degree murder beyond a reasonable doubt.

¶ 96                    II. Admission of the Unredacted Video Recording

¶ 97    Defendant contends that the failure to redact the hearsay statements of ASA D'Angelo from the video recording of his interview with defendant was reversible error.

¶ 98    Over defendant's objection, the jury viewed the unredacted video recording of defendant's interview with ASA D'Angelo. The interview contained the following exchange. The complained-of statements are set forth in italics:

> "[DEFENDANT]: I wasn't planning to shoot [Rico] at all.
>
> ASA D'ANGELO: Now, let's talk a little bit about *** a couple of things. There was [*sic*] two shots that came out of the gun, okay. *We know that from the autopsy that took place today.* So you had to pull the trigger twice.
>
> DEFENDANT: That's why I said it's a lemon squeezer. What it is, it's like, a lemon squeezer, it's like when you pull the trigger on the gun instead of it be one shot, it be two.
>
> ASA D'ANGELO: But that can't happen. *We talked to the people at the lab, okay, and they say it can't happen, okay.* And the bullet wounds on Rico don't line up. *** So you had to pull the trigger twice.
>
> DEFENDANT: No, I pulled the trigger once.
>
> ASA D'ANGELO: You pulled the trigger once. You sure?
>
> DEFENDANT: Positive."

ASA D'Angelo then questioned defendant about the gun as follows:

"I know you said you dropped [the gun], *but I talked to [Duane Smith] and I talked to your cousin [Devon Patton] and they said you ran with it.*

DEFENDANT: I didn't run with it. I dropped the gun and then I ran, and then I came back ***" [1]

¶ 99                              A. Standard of Review

¶ 100   The parties agree the trial court's admission of evidence is generally reviewed for an abuse of discretion. *People v. Dunmore*, 389 Ill. App. 3d 1095, 1104 (2009). Defendant maintains that whether a statement qualifies as hearsay is a question of law and as a question of law is subject to *de novo* review.  See *People v. Hall*, 195 Ill. 2d 1, 21 (2000) (courts apply the *de novo* standard of review to questions of statutory interpretations and other questions of law).

¶ 101   Defendant's argument was rejected in *Dunmore* 389 Ill. App. 3d at 1104 (applying the abuse of discretion standard to whether the trial court correctly excluded testimony as inadmissible hearsay); see *People v. Hammonds*, 409 Ill App. 3d 838, 400 (2011) (the appellate court applies an abuse of discretion standard to a trial court's determination of whether a statement is hearsay and if so, whether an exception applies to render it admissible).

¶ 102   Therefore, we will review this issue for an abuse of discretion.  "An abuse of discretion will be found only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court." *Dunmore*, 389 Ill. App. 3d at 1105; see People *v. Bryant*, 391 Ill. App. 3d 228, 245 (2009) (trial court did not abuse its discretion by allowing the jury to view the video recordings of the defendants' interviews with investigators).

¶ 103                              B. Discussion

¶ 104 Defendant contends that the complained-of statements were hearsay and therefore inadmissible. Hearsay is an out-of-court statement offered to establish the truth of the matter asserted. *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33. If the statement is offered for a reason other than to prove the truth of the matter asserted, it is not hearsay. *Dunmore*, 389 Ill. App. 3d at 1106. An out-of-court statement offered to prove the effect on the listener's mind or to show why the listener later acted as he did is not hearsay and is admissible. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). In this case, defendant changed his version of the shooting by an unknown assailant to admitting he shot Rico but maintaining it was unintentional. ASA D'Angelo told defendant what he had been told by the lab personnel and the eyewitnesses for the purpose of seeing how defendant would respond to information contradicting his claim that the shooting was unintentional. We agree with the State that ASA D'Angelo's statements were not offered for their truth and therefore, they were not hearsay.

¶ 105 Defendant further contends that the statements by Duane and Devon were prior inconsistent statements. Prior inconsistent statements are normally inadmissible hearsay. *Gonzalez*. 379 Ill. App. 3d at 956. Defendant argues that the failure to redact the video recording allowed the State to present statements by Duane and Devon to the jury that differed from their trial testimony and that bolstered the State's case on the mental-health element.

¶ 106 We disagree. The statements were not hearsay as they were not admitted for their truth. Moreover, the trial court instructed the jury that ASA D'Angelo's statements during the interview with defendant were not evidence, should not be considered as evidence and that the video recording was played solely for the purpose of showing what defendant said about the incident.

¶ 107   Contrary to defendant's contention, in *People v. Whitfield*, 2018 IL App (4th) 150948, *People v. Hardimon*, 2017 IL App (3d) 120772, and *Theis*, our courts have addressed the admissibility of an interviewer's statements. In both *Hardimon* and *Theis*, the courts found statements by the investigating officers to be admissible where they were necessary to show the effect on the defendant or explain his subsequent actions. See *Hardimon*, 2017 IL App (3d) 120772, ¶ 35; *Theis*, 2011 IL App (2d) 091080, ¶ 33.

¶ 108   In *Whitfield*, the reviewing court set forth the following factors for a trial court to consider in determining whether or which questions or statements by the interviewer during an interrogation of the defendant are admissible: (1) whether the questions would be helpful to the jury so as to place the defendant's responses or failure to respond into context, and if so, (2) whether the prejudicial effect of the interviewer's questions or statements substantially outweighs their probative value. *Whitfield*, 2018 IL App (4th) 150948, ¶ 48.

¶ 109   Defendant disputes the trial court's finding that his answers would have been rendered "nonsensical" without the complained-of statements. See *Theis*, 2011 IL App (2d) 091080, ¶ 33 (failure to redact interviewer's statements from a videotape of an interview was not error where without the statements defendant's answers would have been "nonsensical"). We do not believe that in every case a defendant's responses must be reduced to a level of the illogical or the ridiculous to allow the interviewer's statements to be admissible. The court in *Whitfield* found that interviewers' statements "may still possess probativeness where they are simply helpful, although not essential or 'necessary' to a jury's understanding of the defendant's responses or silence." *Whitfield*, 2018 IL App (4th) 150948, ¶ 48 (disagreeing with higher probability requirement set forth in *Hardimon* and *Theis*). In the present case, ASA D'Angelo's statements provided context

and were helpful in understanding defendant's responses to the information contradicting his claim that the shooting was unintentional.

¶ 110   Defendant maintains that the unredacted video recording was unduly prejudicial.  See *Whitfield*, 2018 IL App (4th) 150948, ¶ 47 (even relevant evidence may be excluded where its probative value is substantially outweighed by it prejudicial effect). In *Hardimon*, the reviewing court found defense counsel ineffective for failing to move to redact portions of a videotaped interview of the defendant by two detectives. *Hardimon*, 2017 IL App (3d) 120772, ¶ 39. The court found the portion of the video recording in which the detectives challenged the defendant's protestations of innocence, made threats as well as promises of leniency if he confessed and told him that he would definitely be found guilty was unnecessary in that it was not relevant and was highly prejudicial. *Hardimon*, 2017 IL App (3d) 120772, ¶¶ 36-37.

¶ 111    In contrast, ASA D'Angelo's statements were relevant to defendant's claim that he did not intend to shoot Rico. The ASA did not use the statements to disparage defendant but to ask him to explain why the physical evidence did not support his version that the shooting was unintentional. Defendant was not accused of lying, and he was not threatened by ASA D'Angelo. Moreover, unlike the present case, the court in *Hardimon* found that its finding of prejudice was supported by the lack of evidence directly connecting the defendant to the crime. *Hardimon*, 2017 IL App (3d) 120772, ¶ 39.

¶ 112   Defendant argues that ASA D'Angelo's comments were far more prejudicial than those in *Theis*. In that case, during an interview with the defendant, the following colloquy occurred:

"DETECTIVE NACHMAN: I know some things happened between you and [the victim]. Alright. I want to know why. *** *** You have to be honest with me about it, what am I supposed to think?

DEFENDANT: That I did it.

DETECTIVE NACHMAN: No, I know you did it. I'm going to think that you're a stone-cold predator. *** I'm saying something happened one time. It's overwith [*sic*]. And I am not saying I believe it's ever going to happen again. But you have to prove that to me. You have to tell me why things happened that day. I am not asking you if things happened. I know things happened. That's not an issue.

DEFENDANT: You've already accused me of doing it when I have no clue what I've done or anything else.

DETECTIVE NACHMAN: Things happened between you and [the victim] and Valorie (the defendant's wife).

* * *

DETECTIVE NACHMAN: I know things have happened without either of you telling me. Because there's physical evidence. Period. Right now all you got is what I know and what Valorie is telling me and you telling me nothing happened makes you look not so good.

DEFENDANT: Of course she's saying that I did it or did this or she did this or whatever, she's crazy because she didn't do nothing and I didn't do nothing so however you're going to —

DETECTIVE NACHMAN: I already know that's not true, John. We came to your door because we have been working this investigation for quite some time. [The victim] was honest with me about what happened. We didn't come talk to you for no reason." *Theis*, 2011 IL App (2d) 091080, ¶ 31.

¶ 113   Defendant claims that in *Theis*, the detective told the defendant only that his investigation revealed inculpatory physical evidence and that there was a witness' statement, omitting any details as to what the evidence was or what the witness stated. However, in both *Theis* and the present case, the interviewer made statements alluding to the existence of evidence and statements challenging the defendants' denials of their actions or intent. If anything, Detective Nachman's statements to the defendant in *Theis* were more prejudicial, telling the defendant that not only that there was the evidence establishing his guilt, but the detective knew the defendant was lying when he denied his guilt.

¶ 114   Defendant's reliance on *People v. Musser*, 494 Mich. 337 (2013) is misplaced.  In *Musser*, the Michigan supreme court found that a detective's statement had no probative value where it provided context to the response of another detective rather than to the defendant's statements. The court further found that a number of other statements by the detective could have been redacted without harming the probative value of the defendant's responsive statement. *Musser*, 494 Mich. at 360.  The court then found that even if there was some probative value to certain of the unredacted statements, the minimal probative value was outweighed by the danger of unfair prejudice to Musser in a child sex abuse case. *Musser*, 494 Mich. at 362-63 (noting that courts needed to protect innocent defendants in such cases given the suggestibility and the prejudicial

effect an expert's testimony may have on a jury and finding that the detective's expertise and knowledge gave him the aura given to expert witnesses).

¶ 115    *Musser* is distinguishable. The present case does not involve allegations of child sex abuse, which the court in *Musser* found to be a significant factor in evaluating the prejudice to the defendant factor. There the court found the defendant was entitled to a new trial where the evidence was not overwhelming, and the limiting instruction that the jury was not to consider the detectives' questions and statements in the interview with defendant as evidence was not sufficient to satisfy the court that the error in admitting the unredacted videotape did not undermine the verdict. *Musser*, 494 Mich. at 363-65.

¶ 116    The fact that the trial court in *Musser* gave the limiting instruction only after the jury was shown the videotape is significant. The instruction was given after the recording was presented to the jury and after an hour-long recess. The reviewing court in *Musser* observed that:

> "[T]he jury viewed the recording with the unqualified instruction in mind that the recording was evidence only to later be informed that all of the recording's contents could not be considered as such. [Citation.] ***[T]he risk that the jury accepted the contents of the recording as substantive evidence was heightened by the lack of a limiting instruction before the improperly admitted statements were presented to the jury. Accordingly, *although an appropriate limiting instruction may reduce prejudice to a defendant, the lack of a timely limiting instruction in this case reinforces our conclusion that an error-requiring reversal occurred*." (Emphasis ours.) *Musser*, 494 Mich. at 365.

In contrast, *prior* to viewing the videotape of defendant's interview with ASA D'Angelo, the jury was instructed that the ASA's comments on the videotape were not evidence and were to be

considered solely for the purpose of what defendant said about the incident. Additionally, unlike *Musser*, the evidence in the present case was more than sufficient for the jury to find defendant guilty of first degree murder.

¶ 117   In sum, ASA Angelo's statements to defendant during their interview were not hearsay and were necessary as well as helpful to the jury. Telling defendant that individuals and the physical evidence contradicted his claim that he only pulled the trigger one time served to ascertain defendant's reaction to information that disputed his claim that he did not intend to kill Rico. ASA D'Angelo's statements were relevant and did not prejudice defendant. Moreover, the trial court's instruction to the jury prior to the playing of the video recording that the statements, other than defendant's, were not evidence was sufficient in this case to eliminate any prejudice to defendant.

¶ 118   Finally, we find no abuse of discretion in the trial court's refusal to instruct the jury that ASA D'Angelo's statements may have been false. Defendant acknowledges that law enforcement may lie to a defendant during a custodial interrogation. See *People v. Melock*, 149 Ill. 2d 423, 450 (1992) (a confession obtained by deception does not invalidate a confession as a matter of law). In this case, defendant did not deny shooting Rico, but despite what ASA Angelo told him the witnesses had stated, defendant never wavered from his position that he did not intend to kill him.

¶ 119   Defendant's reliance on *People v. Jackson* 331 Ill. App. 3d 279 (2002) is misplaced. In *Jackson*, the reviewing court determined that it was insufficient for the trial court to instruct the jury that the evidence of the defendant's prior crimes was to be considered only for the purpose of determining the defendant's *modus operandi*, where the instruction it received did not define the term, and the court refused to give the defendant's proposed instruction defining it. *Jackson*, 331 Ill. App. 3d at 282-83. The reviewing court refused to assume that jurors would be familiar with a

term that had its origins in a foreign language, and the defendant's instruction correctly defined the term. *Jackson*, 331 Ill. App. 3d at 291.

¶ 120   In the present case, the trial court's instruction contained no words borrowed from a foreign language for the jurors to decipher their meaning. The jury was instructed that ASA D'Angelo's statements were not evidence and were not to be considered as evidence. The jury is presumed to follow the instructions given to it by the trial court. *People v. Mims*, 403 Ill. App. 3d 884, 897 (2010).

¶ 121   For all of the foregoing reasons, we conclude that the trial court's denial of defendant's motion to redact the complained-of statements by ASA D'Angelo from the video recording was not an abuse of discretion. We further conclude that the trial court's refusal to instruct the jury that ASA D'Angelo's statements in his interview with defendant may have been false was not an abuse of discretion.

¶ 122                    III. Confrontation Clause Violation

¶ 123   Defendant contends that his sixth amendment right to confront the witnesses against him was violated when he was not permitted to cross-examine Dr. Arangelovich, the assistant medical examiner who conducted the autopsy on Rico's body and prepared the written report. He further contends that the error was not harmless beyond a reasonable doubt.

¶ 124                    A. Standard of Review

¶ 125   A defendant's claim that his sixth amendment right of confrontation was violated constitutes a question of law, and our review is *de novo*. *People v. Barner*, 2015 IL 116949, ¶ 39.

¶ 126                    B. Discussion

¶ 127  In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that the confrontation clause bars the admission of testimonial statements of a witness who does not testify unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U. S. at 68.

¶ 128  Defendant contends it was error to admit Dr. Zukariya's testimony and the written autopsy report. He argues that Dr. Arangelovich's description of Rico's injuries in the written autopsy report was the sole basis for Dr. Zukariya's opinion that there were two gunshot wounds on Rico's body. Defendant maintains that the State used the autopsy report and Dr. Zukariya's testimony to establish that defendant fired two gunshots into Rico, which evidenced his intent to kill Rico. Defendant insists that the error in admitting ASA D'Angelo's reference to the autopsy report in his interview with defendant, the autopsy report and Dr. Zukariya's testimony could not be harmless since the State's evidence of defendant's intent to kill or knowledge that his actions would cause death or great bodily harm to Rico was far from overwhelming.

¶ 129  If an autopsy report is properly admitted into evidence, the testimony of the expert witness cannot have violated the confrontation clause even if it had the effect of offering the report for the truth of the matter asserted. *People v. Leach*, 2012 IL 111534, ¶ 57. Therefore our focus is on whether the admission of the autopsy report violated the confrontation clause because it was testimonial.

¶ 130  In determining whether a document is testimonial, the court makes an objective determination of the primary purpose for the statement's creation. *Leach*, 2012 IL 111534, ¶ 120. In *Leach*, our supreme court determined that where an autopsy report was not prepared for the

primary purpose of accusing a targeted individual or for the primary purpose of providing evidence in a criminal case, the report was not testimonial. *Leach*, 2012 IL 111534, ¶ 122.

¶ 131 Defendant points out that the court in *Leach* acknowledged that an autopsy report could be testimonial. The court in *Leach* held that autopsy reports "should be deemed testimonial only in the unusual case in which the police play a direct role (perhaps by arranging for the exhumation of a body to reopen a 'cold case') and the purpose of the autopsy is clearly to provide evidence for use in a prosecution." *Leach*, 2012 IL 111534, ¶ 133. Defendant's contention that his case falls into those exceptions is not supported by the record.

¶ 132 The autopsy on Rico's body was not performed at the direction of the police. It was conducted in accordance with Illinois law, which required that the county coroner or medical examiner conduct a preliminary investigation into the circumstances of a sudden and violent death, whether the death appears to be the result of suicide, homicide or accident. *Leach*, 2012 IL 111534, ¶ 126; see 55 ILCS 5/3-3013(a) (West 2012). The autopsy was conducted by Dr. Arangelovich later in the morning of Rico's death on June 20, 2007. Although following the shooting, defendant was taken to the Harvey police station and held there, Detective Escalante testified that he was not originally a suspect. ASA D'Angelo's interview of defendant in which he referred to the autopsy report took place on June 22, 2007, two days later. The autopsy report did not refer to defendant or otherwise link him to Rico's death.

¶ 133 In *People v. Crawford*, 2013 IL App (1st) 100310, the reviewing court determined that the primary purpose of the autopsy in the case before it was to determine the cause of death and not to accuse a targeted individual of criminal conduct or to provide evidence at a criminal trial. *Crawford*, 2013 IL App (1st) 100310, ¶ 151. The defendant was not targeted in the autopsy report,

and the court found no evidence in the record that the police provided information to the assistant medical examiner who did the autopsy or the chief medical examiner who testified as to the results of the autopsy at trial that the defendant murdered the victim. *Crawford*, 2013 IL App (1st) 100310, ¶ 152. Likewise, in the present case, there was no evidence that the autopsy report targeted defendant. While the State was able to use the autopsy report to support its two-shot theory as to defendant's intent to kill, there is no evidence the autopsy report was created for any other purpose than to report the results of the examination of Rico's body in compliance with state law. Moreover, it was not error to have Dr. Zukariya testify in place of Dr. Arangelovich who performed the autopsy. See *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 43; *Crawford*, 2013 IL App (1st) 100310, ¶ 151.

¶ 134 Defendant maintains that neither *Leach* nor its progeny dealt with a situation in which the State used the autopsy report authored by a witness who was not available for questioning to prove a disputed fact, *i.e.*, that he fired more than one shot. He directs this court to *State v. Navarette*, 294 P.3d 435 (N.M. 2013). In that case, the New Mexico supreme court held that statements in an autopsy report where the individual suffered a violent death were testimonial. *Navarette*, 294 P.3d at 441. The court determined that because the autopsy was performed as part of a homicide investigation, the statements in the report were primarily intending to establish some facts or opinions with the understanding that they may be used in a homicide investigation. The court further noted that under New Mexico law, cases of violent, sudden or untimely death must be reported to law enforcement and that medical examiners were required to report their findings directly to the district attorney in all cases they have investigated. *Navarette*, 294 P.3d at 440-41.

¶ 135    *Navarette* does not aid the defendant's argument since that court held that all autopsy reports in violent death cases were testimonial. Moreover, the court in *Leach* acknowledged the split of opinion regarding the application of the primary purpose test to reports of forensic testing. Nonetheless, the court in *Leach* concluded that "autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial. Further, an autopsy report prepared in the normal course of business of a medical examiner's office is not rendered testimonial merely because the assistant medical examiner performing the autopsy is aware that police suspect homicide and that a specific individual might be responsible." *Leach*, 2012 IL 111534, ¶ 136.

¶ 136    Applying the primary purpose test set forth in *Leach*, we conclude that in the present case the autopsy report was nontestimonial and was properly admitted into evidence. In addition, there was no error in permitting Dr. Zukariya to testify to the autopsy report authored by Dr. Arangelovich. Since we have found no error, we need not conduct a harmless error analysis.

¶ 137                    IV. Ineffective Assistance of counsel

¶ 138    Defendant contends that he was denied the effective assistance of counsel where his trial attorney failed to request that the trial court instruct the jury on the mental state of "knowingly."

¶ 139                    A. Standard of Review

¶ 140    "Where the facts surrounding the ineffective assistance claim are undisputed and the claim was not raised below, this court's review is *de novo*." *People v. Wilson*, 392 Ill. App. 3d 189, 197 (2009).

¶ 141                    B. Discussion

¶ 142    In determining whether a defendant was denied the effective assistance of counsel, the reviewing court applies the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Falco*, 2014 IL App (1st) 111797, ¶ 14. "To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant such that he was deprived of a fair trial." *Falco*, 2014 IL App (1st) 111797, ¶ 14. "The performance prong is satisfied if 'counsel's performance was objectively unreasonable under prevailing professional norms,' and the prejudice prong is satisfied if there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (Internal quotation marks omitted.)." *People v. McGhee*, 2012 IL App (1st) 093404, ¶ 11 (quoting *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010)). Both prongs of the *Strickland* test must be satisfied, or the claim fails. *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 143    In Illinois, counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy. *Falco*, 2014 IL App (1st) 111797, ¶ 16. " 'Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence,' and therefore, are 'generally immune from claims of ineffective assistance of counsel.' " *Falco*, 2014 IL App (1st) 111797, ¶ 16 (quoting *People v. Enis*, 194 Ill. 2d 361, 378 (2000)). However, the failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that counsel's failure to request denied the defendant his right to a fair trial. *Falco*, 2014 IL App (1st) 111797, ¶ 16.

¶ 144    The jury was instructed on involuntary manslaughter (Illinois Pattern Jury Instructions, Criminal, Nos. 7.07 and 7.08) (4th ed. 2000) (hereinafter IPI Criminal 4th)) and the definition of "recklessness," the mental state for that offense (IPI Criminal 4th, Nos. 5.01). Defendant maintains that the since his mental state at the time of the shooting was the central issue in this case, the jury should have been instructed on "knowingly," the mental state for first degree murder so the jury would understand the difference between "knowingly" and "recklessness." Defendant further maintains that had the jury been instructed on the definition of "knowingly," it would have found him guilty of involuntary manslaughter rather than first degree murder. We disagree.

¶ 145    "[T]he jury need not be instructed on the terms knowingly and intentionally because those terms have a plain meaning within the jury's common knowledge." *People v. Powell*, 159 Ill. App. 3d 1005, 1013 (1987); see IPI Criminal 4th, Nos. 5.01B, Committee Note (Committee took no position as to whether the definition should be given routinely in the absence of a specific jury request). Illinois courts have found that the term "knowing" "has a plain and ordinary meaning within the jury's common knowledge, and no instruction need be given absent the jury's request for a definition or expression of confusion." *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547, ¶ 94 (collecting cases).

¶ 146    Defendant relies on *People v. Griffin*, 351 Ill. App. 3d 838 (2004). In that case, the jury was instructed on first degree murder and manslaughter as well as on the definition of recklessness. During deliberations, the jury sent a note to the trial court asking for clarification as the difference between knowledge and intent. The court gave the first paragraph of IPI Criminal 4th, Nos. 5.01B, requested by the State, which dealt with knowledge in terms of the prohibited

conduct. *Griffin*, 351 Ill. App. 3d at 852. The court refused to give the second paragraph of IPI Criminal 4th, Nos. 5.01B, requested by the defendant, which dealt with knowledge in terms of the prohibited result. *Griffin*, 351 Ill. App. 3d at 852. On appeal, the reviewing court determined that the failure to give the second paragraph of IPI Criminal 4th, Nos. 5.01B constituted plain error because (1) the defendant's mental state at the time she performed the acts resulting in death was the only contested issue; (2) the evidence as to her mental state was closely balanced; and (3) especially in light of the jury's request for clarification of the mental-state issue, the failure to correctly instruct the jury regarding the mental state of knowledge denied the defendant a fair trial. *Griffin*, 351 Ill. App. 3d at 855.

¶ 147   In the present case, while defendant's mental state was the only contested issue, unlike *Griffin*, the evidence as to defendant's mental state was not closely balanced. In *Griffin*, the defendant was holding her infant son trying to calm him but squeezed him too tightly and he suffocated. Other than her two-year child, the defendant was the only one present at the time of the infant's death. *Griffin*, 351 Ill. App. 3d at 847. In contrast, in the present case, Duane and Devon were present at the time of the shooting. Both men testified that they struggled to keep defendant away from Rico and that Rico did not possess a weapon. Both Duane and Devon testified that defendant had a gun, but neither of them confirmed that defendant had pulled out the gun just to show Rico that he was armed for security purposes nor that there was a struggle for the gun. Significantly, unlike the jury in *Griffin*, the jury in the present case did not ask for clarification of the term "knowingly."

¶ 148   Defendant's reliance on *People v. Howard*, 232 Ill. App. 3d 386 (1992), is misplaced. In that case, the defendant claimed he was denied the effective assistance of counsel when counsel

failed to request an instruction defining "recklessness." On appeal, the reviewing court agreed and reversed for a new trial. The court acknowledged that "[a] term which is employed in a general, nontechnical context need not be defined as long as nothing in the instruction obscures its meaning. This is especially true where the applicable Illinois instruction does not instruct that an additional definition is necessary." *Howard*, 232 Ill. App. 3d at 392. The court noted that IPI instruction on involuntary manslaughter "specifically refers to the definitional instruction of 'recklessness,' which should accompany it." *Howard*, 232 Ill. App. 3d at 392. Because recklessness to an individual might mean no more than ordinary negligence, a juror may have chosen murder, which was the only alternative presented in that case. *Howard*, 232 Ill. App. 3d at 392.

¶ 149    Unlike the IPI instruction on involuntary manslaughter, the IPI instruction on first degree murder does not mandate that the IPI instruction defining "knowingly," should accompany it. In fact, the committee note to IPI Criminal 4th, Nos. 5.01B states that no position was taken as to whether the definitional instruction should be given "in the absence of a specific jury request." IPI Criminal 4th, Nos. 5.01B, Committee Note. Moreover, in *Howard*, the reversal and remand for a new trial were based on the cumulative effect of the State's improper closing argument and the failure of the trial court to define the mental state of recklessness for the jury. *Howard*, 232 Ill. App. 3d at 392-93.

¶ 150    We conclude that defense counsel's failure to request that the jury receive an instruction defining the term "knowingly" was not error. Since defendant failed to satisfy the first prong of the *Strickland* test, his claim of ineffective assistance of counsel fails.

¶ 151                              V. Closing Argument

¶ 152   Defendant contends that the State's remarks in closing and rebuttal argument denied him a fair trial. He maintains that the prosecutor misstated the mental state for first degree murder when he told the jury that the fact that defendant armed himself with a gun was a knowing and intentional act. He also argues that the prosecutor's statement equating recklessness with the scenario of a gun discharging while children were playing with it was improper argument, which prejudiced him.

¶ 153                              A. Standard of Review

¶ 154    Our supreme court has not yet addressed the tension between its decisions in *People v. Wheeler*,  226 Ill. 2d 92, 123 (2007) and *People v. Blue*, 189 Ill. 2d 99 (2000) as to whether the *de novo* standard or the abuse of discretion standard applied to review of alleged errors in closing arguments. The lack of clarity has resulted in diverse holdings by Illinois Appellate Court Districts as to the appropriate standard of review. See *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 46. Different divisions of this district have applied the *de novo* standard, the abuse of discretion standard, or have resolved the issue by concluding that the holding would be the same under either standard. See *Anaya*, 2017 IL App (1st) 150074, ¶ 46; *People v. Sandifer*, 2016 IL App (1st) 133397; *People v. Kelley*, 2015 IL App (1st) 132782; *People v. Anderson*, 407 Ill. App. 3d 662 (2011).

¶ 155   More recently, in *People v. Phagan*, 2019 IL App (1st) 153031,[3] the Second Division of this court concluded that the abuse of discretion standard of review applied to alleged errors in closing argument. *Phagan*, 2019 IL App (1st) 153031, ¶ 48. Examining the case law as far back as 1892, the court determined that there was historical support for choosing the abuse of

[3] No. 125249 *People v. Phagan*, leave to appeal pending, November 1, 2019 term.

discretion standard over the *de novo* standard. *Phagan*, 2019 IL App (1st) 153031, ¶¶ 49-54. We are persuaded by the analysis in *Phagan*, and therefore, we will apply the abuse of discretion standard of review to defendant's allegations of error by the prosecutor in closing argument.

¶ 156                                      B. Discussion

¶ 157    The prosecutor has wide latitude during closing argument and may comment on the evidence and any reasonable inference from that evidence. *People v. Land*, 2011 IL App (1st) 101048, ¶ 154.  A prosecutor may not misstate the law or attempt to shift the burden of proof to the defense. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶¶ 31, 34. Nonetheless, the prosecutor's closing argument requires reversal only if the remarks created substantial prejudice to the defendant. *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 114. Reversal and a new trial are warranted if the improper remarks constituted a material factor in a defendant's conviction. *People v. Smith*, 402 Ill. App. 3d 538, 542 (2010).  "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Smith*, 402 Ill. App. 3d at 542. Remarks may be improper without creating substantial prejudice to the defendant.  *Donahue*, 2014 IL App (1st) 120163, ¶ 114. The reviewing court considers the complained-of remarks in the context of the entire closing arguments of both parties. *Land*, 2011 IL App (1st) 101048, ¶ 154.

¶ 158    In the present case, the prosecutor argued to the jury:

> "I submit to you, ladies and gentlemen, that is when he took a step, and he took a step to
> arm himself. Even if you can't come to that conclusion, he still had - - we know that he had
> the gun on him. Either way, ladies and gentlemen, he was armed that night. That is

intentional, and that is a knowing act. That is another piece that shows you when he was out there, he is acting with knowledge, and he is acting intentionally."

[DEFENSE ATTORNEY]: Objection. Misstating the law.

THE COURT: Overruled."

¶ 159   During the State's rebuttal argument, the prosecutor told the jury that the State was not required to prove that defendant had a premeditated plan to kill Rico in order to establish first degree murder and reminded them to read the jury instructions. The prosecutor continued:

"Great bodily harm - - well, seriously, folks, when you pull out a gun and point a gun at an individual, especially an individual who is around guns, you know your actions could cause death or great bodily harm.

[DEFENSE ATTORNEY]: Objection, Judge. That misstates the law.

THE COURT: Ladies and gentlemen, please disregard - - overruled. Excuse me, overruled."

¶ 160   Defendant argues that the fact he was in possession of a gun and pointed it at Rico was insufficient to convict him of first degree murder. See *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) ("evidence that the defendant fired a gun, coupled with nothing more, is generally not sufficient to prove a specific intent to kill"); *People v. Banks*, 192 Ill. App. 3d 986, 996-97 (1989) (the defendant was entitled to an involuntary manslaughter instruction where he fired three shots into the ground that ricocheted upwards and struck the victim); *DiVincenzo*, 183 Ill. 2d at 252 (a defendant may act recklessly when he commits a deliberate act but disregards the risk).

¶ 161   Nonetheless, the specific intent to kill may be inferred so long as the surrounding circumstances show that the defendant intended the willfully committed act, which had the direct

and natural tendency to destroy another's life. *Ephraim*, 323 Ill. App. 3d 1110. Here, the prosecutor did not rely solely on defendant's possession of a gun and the fact that it went off to convince the jury that defendant's act of shooting Rico was more than reckless. The prosecutor's argument strove to convince the jury that the sum of defendant's actions, *i.e.* carrying a gun, pulling it out, his anger at Rico and his struggle to break free of Devon and Duane, belied his story that the gun accidently discharged while he was showing it to Rico. The argument highlighted the evidence supporting the State's theory that defendant acted either intentionally or knowingly to kill Rico or cause him great bodily harm. We find no abuse of discretion by the trial court in overruling defendant's objections to the complained-of statements in closing argument.

¶ 162    Defendant acknowledges that his trial attorney did not object to the following argument by the prosecutor on rebuttal:

> "This is first-degree murder. This isn't reckless and involuntary manslaughter. I mean, kids playing around with guns, you hear it in the news all the time, when they are playing around with guns, a gun accidently goes off and shoots someone, that's reckless."

¶ 163    Defendant argues that the prosecutor's statements led the jury to equate recklessness with carelessness, which gave the jury no choice but to find him guilty of first degree murder. He requests that we consider it as either plain error, ineffective assistance of counsel, or considering the other statements properly objected to. See *Wheeler*, 226 Ill. 2d at 123 (statements not objected to may add context to properly objected-to ones). To some extent, each of the analyses requested by defendant requires error to have occurred. Therefore, we address that question first.

¶ 164    Defendant maintains that his case is very similar to *People v. Buckley*, 282 Ill. App. 3d 81 (1996). In *Buckley*, the defendant was charged with involuntary manslaughter when her infant

daughter died from an overdose of medication. During closing argument and again on rebuttal, the prosecutor told the jury that recklessness meant carelessness. The reviewing court found the prosecutor misstated the law as to the mental state for the commission of involuntary manslaughter, noting that an act performed accidently, carelessly or even negligently was insufficient to prove or sustain a conviction for involuntary manslaughter. *Buckley*, 282 Ill. App. 3d at 89. While the claim of error had not been preserved for review, the court found the evidence closely balanced and that while error in closing argument was not usually reversible error, in this case, the court could not state with any degree of certainty that the misstatement did not contribute to the guilty verdict. The defendant's conviction was reversed and the case remanded for a new trial. *Buckley*, 282 Ill. App. 3d at 90-91.

¶ 165    *Buckley* does not aid defendant. In the present case, neither of the prosecutors told the jury that defendant could only be convicted of involuntary manslaughter if his conduct was accidental or careless. Moreover, we consider the complained-of statement in the context of the argument in which it appeared. The prosecutor followed the complained-of statement as follows:

"Maybe shooting at the ground and then hitting the individual and killing them, that may be reckless. But pointing a gun at somebody when you are upset, when you are ticked off, and again, I mean this is how ticked off he was, you heard that from Duane. Everybody walking across the street, he goes out of his way from the group, before they go across the street, and as my partner stated, clearly gets the gun and then comes back. He knows he means business in this case. He is going to show that he is the tough guy in this case. He is going to show that he is the man in this case. This is intentionally, knowingly, playing with

guns, not an accident, not kids playing with guns, not a gun accidently going off. This is

first-degree murder."

¶ 166 We find no error in the prosecutor's argument. The prosecutor's argument illustrated for

the jury the difference between reckless acts and defendant's act in shooting Rico. Considering

the complained-of statement in the context of the entire closing argument, we are satisfied that the

reference to children playing with a gun did not contribute to the defendant's conviction for first

degree murder rather than involuntary manslaughter.

¶ 167                                    VI. Vagueness Challenge

¶ 168 Defendant contends that the mandatory enhancement sentencing provision set forth in

section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West

2012)) is unconstitutionally vague on its face because it provides no objective criteria to guide trial

courts in imposing sentences. According to defendant, the failure to provide criteria in imposing

the sentencing add-ons ensures that trial courts will rely on the same aggravating factors to

determine the sentence for both the underlying murder and for the firearm enhancement, which

encourages improper double enhancements at sentencing. Defendant acknowledges that this court

previously rejected vagueness challenges to section 5-8-1(a)(1)(d)(iii) in *People v. Butler*, 2013 IL

App (1st) 120923 and *People v. Thompson*, 2013 IL App (1st) 113105. However, he maintains

that *Butler* and *Thompson* "fundamentally misinterpreted the statute" and that *Butler* did not

resolve the question in the present case, *i.e.*, whether the statute is unconstitutionally vague because

once the enhancements are triggered, it fails to provide objective standards necessary to avoid

arbitrary sentencing.

¶ 169   All statutes are presumed to be constitutional. *In re R.C.*, 195 Ill. 2d 291, 296 (2001). As the issue of considering the constitutionality of a statute is one of law, our review is *de novo*. *People v.* Jung, 192 Ill. 2d 1, 4 (2000). A vagueness challenge is actually a contention that the statute violates due process because due process requires that a statute give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 138. A statute is unconstitutionally vague if its terms are so ill-defined that their meaning will ultimately be determined by the opinions and whims of the trier of fact rather than any objective criteria. *Sharp,* 2015 IL App (1st) 130438, ¶ 138.

¶ 170   Public Act 91-404 amended the penalty provisions of several statutes, including the provisions for first-degree murder, by adding what have been referred to as the "'15/20/25-to-life'" provisions. *People v. Sharpe*, 216 Ill. 2d 481, 484 (2005 (citing Pub. Act 91-404, § 4 (eff. Jan. 1, 2000)); *People v. Walsh*, 2016 IL App (2d) 140357, ¶ 19. Under those provisions, a mandatory enhancement is added to a defendant's sentence if the defendant used a firearm in the commission of the offense. *Walsh*, 2016 IL App (2d) 140357, ¶ 19. The length of the enhancement depends on how the firearm was used. *Walsh*, 2016 IL App (2d) 140357, ¶ 19.

¶ 171   Our supreme court concluded in *Sharpe* that there was no double-enhancement problem with the sentencing add-on, noting that while it agreed with the defendant that the degree of harm required to invoke the 20-to-life enhancement was inherent in the crime of murder, the enhancement required that the harm be caused by the firearm. *Sharpe*, 216 Ill. 2d at 528-29. Additionally, the court noted that the general rule against double enhancement was "merely a rule of construction established by the court, which arises from the presumption that the legislature considered the factors inherent in the offense in setting the initial penalty for that offense.

[Citations]. But where the legislature has made clear an intention to enhance the penalty for a crime, even in a way which might constitute double-enhancement, this court will not overrule the legislature." *Sharpe*, 216 Ill. 2d at 530. Accordingly, we reject defendant's claim that the sentencing add-on is an impermissible double-enhancement of his sentence.

¶ 172  Moreover, as defendant notes, this court has previously considered and rejected the same vagueness arguments raised in the present case, concluding that there was a clear and definite scope of the sentencing range, 25-to-life, and the trial court had no discretion concerning whether to apply the enhancement. *Butler*, 2013 IL App (1st) 120923, ¶ 41; *Thompson*, 2013 IL App (1st) 113105, ¶ 120; *Sharp*, 2015 IL App (1st) 130438, ¶ 141.  We also held that the standards for imposing the enhancement were clearly defined; it must be applied when a defendant commits first degree murder and discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement or death. *Id*. The trial court's discretion only applies to the range of the sentence (*Butler*, 2013 IL App (1st) 120923, ¶ 41), and the court may consider any relevant sentencing factors in imposing a firearm add-on. *Walsh*, 2016 IL App (2d) 140357, ¶ 28.  The wide range of the sentence enhancement is appropriate because it is "impossible to predict every type of situation that may fall under the purview of the statute." *Butler*, 2013 IL App (1st) 120923, ¶ 41.

¶ 173  In accord with the decisions in *Butler* and followed in *Thompson* and *Sharp*, we hold that the 25-years-to-life sentence enhancement is not unconstitutionally vague.  See also *People v. Brown*, 2017 IL App (1st) 142197, ¶ 80 (we have reviewed these very same arguments and determined that the 25-to-life sentence enhancement is not unconstitutionally vague, and we continue to follow those cases).

¶ 174                                    VII. Excessive Sentence.

¶ 175    Finally, defendant contends that where he made what the State agreed was a "rash decision"

during an argument between friends who had been drinking, his 50-year sentence was excessive.

Defendant, who was 24 years old at the time of the offense, contends that his sentence was a *de*

*facto* term of natural life imprisonment.

¶ 176                                    A. Standard of Review

¶ 177    A reviewing court will not reverse the trial court's sentencing decision absent an abuse of

discretion. *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 134. Where the trial court has imposed a

sentence within the prescribed statutory limits, the reviewing court will not find an abuse of

discretion unless the sentence is greatly at variance with the purpose and spirit of the law or is

manifestly disproportionate to the offense. *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 178                                    B. Discussion

¶ 179    Defendant was convicted of first degree murder, which carried a sentence between 20 and

60 years imprisonment (730 ILCS 5/5-4.5-20(a) (West 2012)). Because he personally discharged

a firearm resulting in Rico's death, a mandatory sentencing enhancement ranging from 25 years to

a term of natural life imprisonment (730 ILCS 5/5-8-1(d) (iii) (West 2012)) was to be added to his

sentence for first degree murder. Defendant was sentenced to 25 years for first degree murder, five

years over the minimum sentence for that offense, and the minimum mandatory enhancement of

25 years.

¶ 180    Defendant acknowledges that his 50-year sentence is within the statutory limits. He argues

the trial court failed to consider that he was young and immature, that he was not beyond

rehabilitation, he had only one prior conviction and that the shooting, while tragic, was not so

heinous as to require the imposition of a sentence, which amounted to a *de facto* life sentence. He requests that this court reduce his sentence for first degree murder to 20 years, the minimum sentence for that offense, which would require him to serve an aggregate sentence of 45 years.

¶ 181    "A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 68. "The seriousness of the offense, and not the mitigating evidence, is the most important sentencing factor." *Vega*, 2018 IL App (1st) 160619, ¶ 68. "The trial court is in the superior position to determine an appropriate sentence because of its personal observation of defendant and the proceedings." *Vega*, 2018 IL App (1st) 160619, ¶ 68.

¶ 182    In imposing the 50-year sentence, the trial court took special note of defendant's social history, particularly defendant's lack of family relationships. The court agreed with trial counsel's statement that defendant had no one to teach him how to act like a man. However, the court was troubled by the circumstances of the offense, one of "senseless, senseless violence," and telling defendant that he "acted like a coward as far as I am concerned." In addition to the serious harm caused by defendant's conduct, the court considered defendant's criminal history, which began when he was age 14 with juvenile arrests for aggravated battery and assault. At age 18, defendant was convicted of home invasion for which he received a six-year sentence and was age 22 when he was released from mandatory supervised release. Two years later at age 24, defendant was charged with murder in the present case. The court concluded that the sentence was necessary to deter others from committing the same crime.

¶ 183   The imposition of a sentence only five years more than the mandatory minimum for first degree murder reflects that the trial court gave proper consideration to the mitigating factors and the seriousness of the offense. The trial court's sentence was not an abuse of discretion.

¶ 184                                      CONCLUSION

¶ 185   For all the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 186   Affirmed.